PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　v.

ZIA HASSANZADEH,
　　　　　*Defendant-Appellant.*

No. 01-4155

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CR-00-308)

Argued: September 28, 2001

Decided: November 13, 2001

Before MICHAEL and MOTZ, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Michael and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** James Clyde Clark, LAND, CLARK, CARROLL, MEN-
DELSON & BLAIR, P.C., Alexandria, Virginia, for Appellant. Kath-
leen Marie Kahoe, Assistant United States Attorney, Alexandria,
Virginia, for Appellee. **ON BRIEF:** Kenneth E. Melson, United
States Attorney, Alexandria, Virginia, for Appellee.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

After a bench trial, the district court convicted Zia Hassanzadeh of aiding and abetting the making of a false statement and illegally importing carpets of Iranian origin, in violation of 18 U.S.C.A. § 542 (West 2000) and 18 U.S.C.A. § 545 (West 2000) respectively, and sentenced him to 18 months of imprisonment on each count, to run concurrently. Hassanzadeh appeals, challenging his convictions and sentence. We affirm.

I.

In February 2000, customs officials at Dulles Airport stopped a shipment of eighty-three carpets that was en route to a company operated by Hassanzadeh. One carpet had a tag stapled to it that read "Made in Iran," and approximately twenty were not marked in English with a country of origin, as federal law requires. *See* 19 U.S.C.A. § 1304 (West 1999 & Supp. 2001). Customs officials had the shipment appraised, and sixty-one carpets were eventually determined to have been made in the area currently known as Iran. An Executive Order prohibits the importation of goods "of Iranian origin." *See* Exec. Order 12,613, 31 C.F.R. § 560.201 (1987).[1]

On March 13, 2000, customs officials notified Hassanzadeh's company that some of the carpets were not marked with a country of origin and that the shipment could not be released until all the carpets were marked. Two days later, Ahmad Noor Kaker, a Hassanzadeh employee, went to Dulles Airport, at Hassanzadeh's direction, to mark the carpets. Kaker put tags on the carpets that identified them as coming from Russia or Turkey, and removed the tag reading "Made in Iran" from the carpet that had carried it. Kaker later returned

---

[1]A few months later, Iranian-origin carpets were exempted from the embargo, without affecting open enforcement actions such as that against Hassanzadeh. 65 Fed. Reg. 25643, 31 C.F.R. § 560.534 (2000). At present, that exemption remains in effect. This opinion, however, addresses the Executive Order and regulations as they existed at the time of Hassanzadeh's offense.

with Ahmad Firoz Hassanzadeh, Zia Hassanzadeh's brother. They took the carpets to a warehouse in Alexandria, Virginia, which was owned by another of Zia Hassanzadeh's companies.

Customs officials obtained a search warrant for the warehouse, where they eventually seized import documents, eighty-two carpets, and some tags like the ones Kaker had attached to the previously unmarked carpets at the airport. Some of the import documents had been altered to replace references to Iranian provinces with references to Turkey or Russia and to lower the stated purchase price of the carpets. For the shipper's address, one invoice gave an address in Germany that is the home address of Firoz Hassanzadeh. Officials also discovered that the website of the Hassanzadeh business that owned the warehouse advertised Persian carpets for sale.

At the time of the search, customs officials questioned Firoz Hassanzadeh, Zia Hassanzadeh, and Kaker. Firoz Hassanzadeh explained that he had altered the invoices to reflect what the supplier told him was the true origin of the carpets, and that he could not explain why his home address was listed on an invoice.

Zia Hassanzadeh told customs officers that when the supplier, a Turkish company, said it needed a German address, he suggested using his brother's address. He also told them that only after the carpets had reached his warehouse had he first learned that some of them were Iranian; he learned this from an appraiser whose last name and address he had forgotten at the time of the search (but who later confirmed his account). Zia Hassanzadeh said he had told Kaker to mark all the large rugs as Turkish and all the small rugs as Russian. Finally, he complained that he was being treated unfairly because, he believed, the embargo on Iranian carpets was to be lifted within days.

Questioned during the search, Kaker repeatedly denied having removed any tags at the airport. When confronted with proof, however, he admitted removing the "Made in Iran" tag. A customs official also overheard Kaker muttering to himself that he had made a mistake in picking up the "Persians."

At Zia Hassanzadeh's bench trial, the court admitted evidence of his prior conviction under § 545 for importing Iranian carpets. A pri-

vate customs broker testified that she had faxed a notice giving a date when the carpets should be available at the airport to a "Firoz" at the import company. Both Hassanzadehs testified that they believed the changes to the invoices were correct and that they had no intent to import Iranian carpets illegally.

Zia Hassanzadeh was convicted of one violation of 18 U.S.C. § 542 and one violation of 18 U.S.C. § 545. The district court specifically found beyond a reasonable doubt, as to the § 545 violation, that Hassanzadeh "knew and intended to import and bring into the United States these rugs well knowing that it was unlawful to do so." The court sentenced Hassanzadeh to eighteen months' imprisonment and ordered sixty-one carpets forfeited.

II.

Hassanzadeh asserts that the district court abused its discretion in admitting evidence of his 1997 conviction of violating § 545 by importing carpets of Iranian origin. The district court admitted the evidence as probative of knowledge.

Hassanzadeh initially argues that knowledge is not an element of § 545, eliminating the probative value of the evidence of his prior conviction. He is wrong. Section 545 prohibits anyone from "*knowingly* and willfully, with intent to defraud the United States, smuggl-[ing] . . . any merchandise which should have been invoiced" or "fraudulently or *knowingly* import[ing] or bring[ing] into the United States, any merchandise contrary to law" or otherwise "facilitat[ing]" smuggling "*knowing*" that the smuggled goods were illegally imported. 18 U.S.C.A. § 545 (emphases added).

Alternatively, Hassanzadeh contends that the prejudicial impact of the evidence of his 1997 conviction outweighed its probative value in violation of Federal Rule of Evidence 404(b). Evidence of a prior act is admissible if (1) "relevant to an issue, such as an element of an offense," and "not . . . offered to establish the general character of the defendant," (2) "necessary in the sense that it is probative of an essential claim or an element," (3) reliable, and (4) not so prejudicial that its prejudicial effect outweighs its probative value, "in the sense that

it tends to subordinate reason to emotion in the factfinding process." *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997).

Hassanzadeh's prior conviction for importing carpets of Iranian origin is reliable and both relevant and necessary to establish knowledge, an element of the instant offense; indeed, evidence of the 1997 conviction is particularly salient because it involves a recent § 545 offense identical to the one at issue here. *See id.* at 997. Moreover, we have confidence that at the bench trial, the experienced district judge was able to separate the emotional impact from the probative value of this potentially prejudicial evidence. *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994).

Accordingly, the district court did not abuse its discretion in admitting evidence of Hassanzadeh's prior § 545 conviction.

### III.

Hassanzadeh also argues that the evidence was insufficient to support his conviction under § 545. "The verdict . . . must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942).

Oddly, the crux of this contention seems to be that the Government failed to prove that Hassanzadeh acted *knowingly*. Specifically, Hassanzadeh maintains that there is no evidence that he knew of Kaker's actions at the airport, and considerable evidence that he did not know the carpets' origin: the delivery notice for the carpets was faxed to his brother's attention, not his; his brother testified to having altered the invoices in good faith; and he and his brother both testified that they did not know that any of the carpets were Iranian.

We disagree. The Government produced evidence that Hassanzadeh actively managed the business and that he instructed Kaker to mark the carpets' "national origin" by size. Given this evidence, Hassanzadeh's statements to agents at the search, his initial inability to remember any identifying details about the person who eventually confirmed his story of late discovery that the carpets were Iranian,

and the implausibility of his explanation as to the use of Firoz Hassanzadeh's address, certainly sufficient evidence supported his conviction under § 545.

## IV.

Finally, Hassanzadeh attacks three factors that affected his sentence: the method of calculating the loss figure on which his offense level was based, the value assigned the carpets, and the inclusion in the sentencing calculation of carpets made before the modern state of Iran came into existence in 1935. We conduct a de novo review of the district court's interpretation of the language of the Sentencing Guidelines, *United States v. Bailey*, 975 F.2d 1028, 1030 (4th Cir. 1992); we review the district court's factual findings for clear error. *United States v. Ruhe*, 191 F.3d 376, 390 (4th Cir. 1999).

## A.

Ordinarily, the loss from illegal importation is the tax loss suffered by the Government, the duty evaded. U.S. Sentencing Guidelines Manual § 2T3.1 (2000). However, in the case of "items for which entry is prohibited, limited, or restricted," and "[e]specially when such items are harmful," the Sentencing Commission has emphasized that the evaded duty "may not adequately reflect the harm to society or protected industries." *Id.*, cmt. n.2. In such cases, including that of harm to a protected industry, one suggested alternative method for calculating the loss is "25 percent of the items' fair market value in the United States." *Id.* The district court followed this approach.

Hassanzadeh contends that none of the circumstances for which the Guideline suggests alternative methods of calculating loss exists in his case. He notes correctly that the carpet industry is not a protected industry, and maintains that the duty he evaded adequately captures the "harm to society" from his conduct. He ignores, however, the parameters of the particular offense of which he was found guilty. Hassanzadeh was indicted and convicted of violating § 545 by importing goods specifically banned by an Executive Order and federal regulations promulgated pursuant to it. This Order bars importation of "goods or services of Iranian origin" in order "[t]o ensure that the United States imports of Iranian goods and services will not con-

tribute financial support to terrorism or to further aggressive actions against non-belligerent shipping." *See* Exec. Order No. 12,613, 31 C.F.R. § 560.201 (1987). *See also* Exec. Order No. 13,059, 31 C.F.R. § 560.201 (1997); Exec. Order No. 12,959, 31 C.F.R. § 560.201 (1995). Contribution of financial support to terrorism constitutes a greater harm to society than the harms usually associated with the illegal importation of goods.

Nevertheless, Hassanzadeh argues that even if aid to terrorism does constitute harm to society not adequately captured by the duty evaded, his importation of carpets did not aid terrorism. Because the carpets were imported from Germany, not directly from Iran, he asserts that any benefit they provided to Iran had previously occurred, and that their import from Germany did not tend to promote terrorism. Accordingly, he argues, the duty evaded is a fair measure of the harm done in his case. Both the plain language of the Executive Order and its purpose fatally undermine this contention.

The text of Executive Order 12,613 generally bars the importation into the United States of "goods or services of Iranian origin," not just importation of goods directly from Iran. Moreover, the Order exempts "[p]etroleum products refined from Iranian crude oil in a third country," a provision that would be superfluous if the Order itself permitted importation of all Iranian goods that travelled via a third country. Exec. Order No. 12,613, sec. 2(b). Finally, the Order also exempts from the embargo goods that left Iran directly for the United States *before the Order took effect*. Exec. Order No. 12,163, sec. 2(c). This exemption clearly demonstrates that the Order's general bar applies to more than goods imported directly from Iran to the United States, as Hassanzadeh maintains.

Furthermore, a proscription broader than the limited one suggested by Hassanzadeh most accords with the Order's stated goal of ensuring that United States imports do not further terrorism. Indeed, support of Iranian terrorism could often result if we interpreted the Order, as Hassanzadeh urges, to permit import of Iranian goods as long as they traveled through a third country. We know of no court that has applied such a restrictive interpretation. *See United States v. Noushfar*, 78 F.3d 1442, 1444 (9th Cir. 1996) (reviewing a prosecution for importation of Iranian-origin carpets from Canada to the United

States); *United States v. 863 Iranian Carpets*, 981 F. Supp. 746, 747 (N.D.N.Y. 1997) (affirming the forfeiture of Iranian-origin carpets smuggled to the United States from Canada); *see also United States v. Ehsan*, 163 F.3d 855, 858-59 (4th Cir. 1998).

Thus, the district court did not clearly err in finding that importation of the carpets was illegal despite their recent presence in Germany.

### B.

Nor did the district court clearly err in fixing a value on the carpets. By the time the court sentenced Hassanzadeh, the record contained several expert valuations of the carpets. The Government's expert assigned the carpets a retail value of $155,970. Hassanzadeh's sentencing expert gave the carpets a retail value of $57,000. The customs inspector at the time of importation valued the carpets at $60,183. Hassanzadeh's trial expert gave a wholesale (not retail) value, covering only some of the carpets, of $27,000 to $29,000.

Finding the Government's expert "impressive," the district court used that expert's appraisal in determining the value of the rugs. The court did not err in doing so; findings based on the credibility of witnesses require "great[ ] deference to the trial court's findings." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). Moreover, as the court noted, the offense level Hassanzadeh received would have been the same whether the court accepted the figure of the Government's expert outright or averaged the Government's figure ($155,970) with that of Hassanzadeh's sentencing expert ($57,000).

### C.

Finally, Hassanzadeh challenges the inclusion of 42 carpets made before 1935 in the calculation of the loss amount for sentencing purposes. The modern state of Iran was known as Persia until 1935, when its name was changed to "Iran."[2] According to Hassanzadeh, the pre-

---

[2]The only evidence in the record relating to the status of "Iran" before and after 1935 is testimony by the Government expert who appraised the

1935 carpets were therefore not "of Iranian origin" when they were made. They could have become goods "of Iranian origin" only if they had left Iran or otherwise "entered into Iranian commerce" after 1935. *See* 31 C.F.R. § 560.306 (2000). But nothing in the record indicates when they left the country or otherwise "entered into Iranian commerce." Accordingly, if Hassanzadeh is correct as to the meaning of "Iranian origin," the pre-1935 carpets should not have been included in the loss amount.

The 1935 change of the country's name from Persia to Iran does not, however, bear the weight Hassanzadeh seeks to place on it. We note initially that common usage often applies the contemporary name — Iran — to the country regardless of which period of its long history is being discussed. Thus, a "country study" on Iran by the Federal Research Division of the Library of Congress, completed in 1987 — the same year in which the Executive Order was issued — refers to the country as "Iran," even when speaking of events long before 1935. Federal Research Division of the Library of Congress, *Iran: a country study*, (Helen Chapin Metz ed., 1987) <http://memory.loc.gov.cgibin/query/r?frd/cstdy: @field (DOCID+ir 0000)> (last visited Oct. 8, 2001). Similarly, the State Department's 1994 background note on the country calls the country "Iran" in describing its pre-1935 history. Bureau of Public Affairs of the U.S. Department of State, *Background Notes: Iran*, (July 1994) <http://dosfan.lib.uic.edu/ERC/bgnotes/nea /iran9407.html> (last visited Oct. 8, 2001). Hassanzadeh offers no reason why the Executive Order's use of the terms "Iran" and "Iranian" is not similar to that of other official United States publications.

---

carpets in question. He agreed that "the country of Iran did not exist before 1935" and that "the country wasn't in existence when [some of] these rugs were made." We can, however, take judicial notice that the change in 1935 did not signal the formation of a new state but simply the change of the state's name to "Iran." Central Intelligence Agency of the United States, World Factbook 2001, <http://www.cia. gov/cia/publications/factbook/index.html> (Iran) (last visited Oct. 10, 2001); Bureau of Public Affairs of the U.S. Department of State, Background Notes: Iran, (July 1994) <http://dosfan.lib. uic.edu/ERC/bgnotes/nea/iran 9407.html> (last visited Oct. 8, 2001).

Having said that, we recognize that, standing alone, the language of the Order might be interpreted as Hassanzadeh suggests. Arguably, goods might be "of Iranian origin" either because they were made in a country that denominated itself as Iran at the time the goods were produced, *or* because they were made in the geographic territory now known as Iran.[3] Thus, this language in the Order, read in isolation, might merely ban importation of rugs produced in Iran while it was known as Iran (and thus ban only rugs made after 1935), as Hassanzadeh maintains, rather than prohibiting importation of all rugs produced in the geographic area now known as Iran, as the Government contends.[4] The relevant federal regulations that define "Iranian" and "goods of Iranian origin" for purposes of the Order do little to eliminate this ambiguity. They simply define "Iranian" as "pertaining to Iran," 31 C.F.R. § 560.303 (2000), and "goods of Iranian origin" as "includ[ing] goods grown, produced, manufactured, extracted, or processed in Iran and goods which have entered into Iranian commerce." 31 C.F.R. § 560.306 (2000). Thus, they provide little assistance in determining whether "Iranian origin" is a political limitation (Hassanzadeh's argument) or a geographical one (the Government's position).

The regulatory definition of "Iran," however, does provide guidance. That definition does not use the political name of the country, which is, and since 1979 has been, the "Islamic Republic of Iran." Instead, the regulation defines "Iran" as

> the territory of Iran, and any other territory or marine area, including the exclusive economic zone and continental shelf, over which the Government of Iran claims sovereignty, sovereign rights or jurisdiction, provided that the

---

[3]At least one federal court has enforced Executive Order 12,613's embargo on carpets "of Iranian origin" against carpets produced before 1935. *863 Iranian Carpets*, 981 F. Supp. at 747-48. Another court has approved a search warrant for "Iranian carpets" without reference to their age. *Noushfar*, 78 F.3d at 1446-47. Neither court apparently confronted Hassanzadeh's argument, however.

[4]The record indicates that in addition to the Department of Justice, through the United States's Attorney, the Department of the Treasury, through the chief of the enforcement division of the Office of Foreign Assets Control, also regards the prohibition in the Executive Order as "made without reference to a particular era or political regime."

Government of Iran exercises partial or total *de facto* control over the area or derives a benefit from economic activity in the area pursuant to an international agreement. 31 C.F.R. § 560.303.

The principal portion of this definition, "the territory of Iran," is a geographical, not a political, description, supporting the Government's interpretation of the Order. Although the second part of this definition, expanding the term "Iran" beyond "the territory of Iran," does reference "the Government of Iran," if "Iran" were to be defined purely politically, the first portion of the definition, "the territory of Iran," would be superfluous. We construe a statute or regulation "so that, when possible, no part . . . is superfluous." *United States v. Childress*, 104 F.3d 47, 52 (4th Cir. 1996).

The history of the Executive Order's embargo on Iranian carpets also weighs in favor of the Government's interpretation. As we have said, the Executive Order exempts goods that left Iran, *directly* en route to the United States, before the embargo took effect. Prior to May 1995, even absent direct import, an importer could obtain a license to import a non-fungible good, such as a carpet, by proving that the good had left Iran before the embargo took effect and that "no payment or other benefit has accrued or will accrue to Iran after the effective date." 31 C.F.R. § 560.504(a) (1987-1995). The importer needed "independent corroborating documentary evidence issued and certified by a disinterested party," and could not obtain a license simply by providing "affidavits, statements, and other documents prepared by the applicant or another interested party." 31 C.F.R. § 560.504(c). Under this licensing structure, importers, not federal prosecutors, had the burden of proving when a carpet left Iran in order to escape the embargo. *See United States v. Ahangaran*, 998 F.2d 521, 525 (7th Cir. 1993). President Clinton's decision to rescind the licensing provision in 1995 closed even this narrow avenue to pre-embargo importation. Exec. Order Nos. 12,957 & 12,959, 60 Fed. Reg. 47061, 47062 (Sept. 11, 1995).

The need for such a license, and the high standards required to obtain one, demonstrate the breadth of the core ban on goods "of Iranian origin." To establish a case that an importer had violated the embargo, prosecutors did not need to prove that a carpet had left Iran

after the embargo took place or that its sale had financially benefitted Iran after that date. The regulations assumed that the sale of any carpet of Iranian origin would aid Iran, and provided importers only a limited avenue to refute the point. Now, after the elimination of even this limited avenue, Hassanzadeh's interpretation of "goods of Iranian origin" would place the burden on federal prosecutors to prove when every carpet made before 1935 left Iran. Such a burden is at odds with both the prior licensing structure and its elimination.

Finally, a prohibition on carpets made before the country now known as "Iran" called itself "Iran" furthers the purposes of the embargo. As Hassanzadeh's own sentencing expert testified, modern carpet-makers can make excellent copies of antique carpets, and those in other countries with major carpet industries, including Turkey, India, China, Afghanistan, and Pakistan, have done so with increasing frequency in the last ten years. To interpret the regulations as Hassanzadeh suggests would undoubtedly encourage Iranian carpet makers to imitate pre-1935 carpets. These imitations might be taken for true pre-1935 carpets and so would gain unlawful entry into the United States. In any case, the increased legitimate availability of pre-1935 carpets in this country might well further stimulate the illegal market for cheaper, newer carpets. Thus, permitting importation of pre-1935 Iranian carpets would do precisely what the Executive Order seeks to avoid: encourage the illegal importation of similar carpets made more recently in Iran, aiding Iran financially and so "contribut[ing] financial support to terrorism."

In summary, given the language, history, and purpose of the Executive Order (and the regulations interpreting it), we conclude that rugs made prior to 1935 in the area now known as Iran are goods "of Iranian origin"; the Executive Order bans their importation. Accordingly, the district court did not err when it included these rugs in calculating the loss amount.

V.

For the foregoing reasons, the convictions and sentence are

*AFFIRMED.*