**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MASSOUD BASSIDJI,
            *Plaintiff-Appellee,*

v.

SIMON SOUL SUN GOE,
            *Defendant-Appellant.*

No. 02-16019

D.C. No.
CV-01-04149-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Argued March 13, 2003
Stanford Law School
Stanford, California
Submitted February 23, 2004

Filed June 15, 2005

Before: Alex Kozinski, Susan P. Graber, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

7089

**COUNSEL**

Lori A. Lutzker and W. George Wailes, Carr, McClellan, Ingersoll, Thompson & Horn, Burlingame, California, for the defendant-appellant.

Douglas A. Applegate and Mark W. Epstein, Seiler Epstein Ziegler & Applegate LLP, San Francisco, California, for the plaintiff-appellee.

## OPINION

BERZON, Circuit Judge:

Executive Order 13,059 (the "Executive Order" or "Order"), 62 Fed. Reg. 44,531 (Aug. 21, 1997), prohibits United States citizens from investing in and trading with Iran.[1] The question we face is whether an American citizen's guarantees of payments that furthered a trade agreement with an Iranian company are covered by the Executive Order and, if so, whether the guarantees are unenforceable as a result. We conclude that the guarantees were illegal under the Executive Order and, under the circumstances of this case, unenforceable.

## BACKGROUND

*The First Amended Complaint*

This appeal arises from the district court's denial of the defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). We therefore assume true the following facts, alleged in the First Amended Complaint.[2] *See Libas Ltd. v. Carillo*, 329 F.3d 1128, 1130 (9th Cir. 2003).

"In or around" November 1999, an Iranian company, Seyd Sayyad Ltd. ("SSL"), and a Hong Kong company, Kingdom Enterprises Ltd. ("KEL"), entered into a business arrangement for the purpose of harvesting Artemia cysts (brine shrimp

---

[1]Executive Order 13,059 is appended to this opinion in its entirety.

[2]All quotations in this account are from the complaint or the guarantees.

eggs) from a lake in Iran.[3] The Iranian government required sizeable payments for licenses and other fees to authorize the shrimp egg harvesting project, and SSL undertook related "financial commitments." Karim Arshian, an Iranian citizen affiliated with SSL, "was required to execute several guarantee checks related to the proposed operations."

Simon Goe, a U.S. citizen affiliated with KEL, guaranteed repayment of Arshian's costs by executing two personal guarantees, one on November 12, 1999, and another on January 20, 2000. Each time, Goe promised to reimburse Arshian for any expenditures made in securing the "harvest license, customs clearance, office and living arrangement," up to $1,875,603.[4] "Without the promised guarantees, [Arshian] would have been unwilling to execute the referenced guarantee checks."

Arshian subsequently paid more than $1,875,603 toward these expenses and requested repayment from Goe. Goe refused to honor the guarantees. He paid Arshian nothing. Because Goe did not reimburse Arshian as promised, Arshian could not make the required payments. Arshian was unable to pursue legal action on his own because he was imprisoned, and sold his rights under the guarantees to Massoud Bassidji,

---

[3]In the United States, Artemia cysts are found mostly in Great Salt Lake, although San Francisco Bay also contains them. The cysts are primarily used as aquaculture food for fish and shellfish. *See generally* Gilbert Van Stappen, *Introduction, Biology and Ecology of Artemia*, *in* Manual on the Production and Use of Live Food for Aquaculture, FAO Fisheries Technical Paper No. 361 (Patrick Lavens & Patrick Sorgeloos eds., 1996), http://www.fao.org/DOCREP/003/W3732E/w3732e0m.htm.

[4]We are not told by the parties why there were two seemingly redundant guarantees, nor is it clear in the complaint that the second superseded the first. The place of execution of the first guarantee does not appear on its face, but the complaint alleges that one of the guarantees was signed in California. The second guarantee agreement is printed on the letterhead of KEL, displaying a Hong Kong company address.

who is identified in the complaint as "an individual residing in Toronto, Canada."[5] The record does not show the terms of the assignment, including whether Arshian will receive any of the proceeds if the guarantees are enforced.

*Proceedings in District Court*

Bassidji filed a breach of contract claim in district court in California. Goe asked the court to dismiss the complaint, on the ground that the guarantees were illegal under Executive Order 12,959 (now superseded by Executive Order 13,059) and therefore unenforceable.[6]

Executive Order 13,059, like its predecessor, Executive Order 12,959, bans certain economic transactions by "United States person[s]"[7] with Iran. The Order was promulgated

---

[5]Bassidji was referred to as a Canadian citizen by counsel in the district court and in this court. The representations concerning why Arshian sold the guarantees to Bassidji were also made by Bassidji's counsel but do not appear in the complaint. As nothing in the record contradicts these assertions of counsel, and they are consistent with the complaint, we assume their accuracy for purposes of this opinion.

[6]Goe initially argued that the guarantees were covered by Executive Order 12,959. *See* 60 Fed. Reg. 24,757 (May 9, 1995). Goe has since recognized, however, that Executive Order 12,959 was superseded by Executive Order 13,059, and that the guarantees must therefore be analyzed under Executive Order 13,059. *See* 62 Fed. Reg. at 44,531 (stating that Executive Order 13,059 was being issued "in order to clarify the steps taken in Executive Orders 12957 of March 15, 1995, and 12959 of May 6, 1995, to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States declared in Executive Order 12957 in response to the actions and policies of the Government of Iran"). The district court analyzed this case under Executive Order 12,959. Because we review the district court's ruling on the motion to dismiss *de novo*, *see Wong v. INS*, 373 F.3d 952, 966 n.18 (9th Cir. 2004), we need not remand before applying the appropriate Executive Order.

[7]The Executive Order's section 4(c) defines the term "United States person" as "any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States."

under the authority of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706. Its purpose is " 'to deal with [Iran's] unusual and extraordinary threat to the national security, foreign policy, and economy of the United States,' " *see* Order pmbl., by " 'isolat[ing] Iran from trade with the United States.' " *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1206 (9th Cir. 2003) (quoting *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998) (quoting Executive Order 12,959)) (internal quotation marks omitted); 6 U.S. Dep't of State Dispatch No. 19 (May 8, 1995) (quoting Secretary of State Warren Christopher as stating that Executive Order 12,959 "will ban all U.S. trade and investment with Iran").

The district court denied Goe's motion to dismiss. The court reasoned that the Executive Order and its implementing regulations ban only "specified conduct, for example, the importing of goods or services of Iranian origin or owned or controlled by the Government of Iran into the United States, and whatever transactions were implemented *to further such conduct*" (emphasis added). Because the underlying conduct, the exchange of goods between Hong Kong and Iran, is legal, the district court reasoned, agreements by a United States citizen in furtherance of such a transaction are not prohibited. The district court did not rule, at that time, on Bassidji's alternative argument supporting enforcement of the guarantees: that Bassidji was not *in pari delicto* (equally at fault) with Goe, so the contracts should be enforced despite their illegality to avoid providing Goe a windfall from his illegal actions.

The district court subsequently certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), finding, as § 1292(b) requires, that the order involves a controlling question of law. In so concluding, the district court addressed and rejected Bassidji's *in pari delicto* theory, recognizing that if the agreement were enforceable even if illegal, the illegality question would not control the result. The general rule that illegal contracts are not enforceable, the court stated, is quali-

fied if, "after looking at the kind of illegality and the particular facts involved, enforcement would in fact best achieve the aims of the policy or law the contract violates." Taking the alleged facts as true, the district court concluded that Goe was at greater moral fault, and that conduct similar to Goe's — making guarantee promises and then not honoring them — "would be encouraged by invalidating the guarantees or assignment." The court found, however, that counterbalancing factors of national security, economics, and foreign policy outweighed the moral fault and deterrence considerations.

We granted Bassidji's request for an interlocutory appeal. After oral argument, the parties attempted for some time to mediate their dispute with the aid of the court's mediators. After mediation failed, the case was submitted for decision.

## DISCUSSION

### I.   Choice of Law

To determine whether the Executive Order barred Goe from issuing the guarantees, we must decide whether the Order applies to them. Bassidji maintains that it does not, as Hong Kong law applies. We disagree.

**[1]** Federal subject-matter jurisdiction in this case is based on the parties' diversity of citizenship. We therefore apply the choice-of-law principles of the forum state, here California. *See Stud v. Trans Int'l Airlines*, 727 F.2d 880, 881 (9th Cir. 1984). "To determine the law governing a contract, California courts look to the relevant statute and, for further guidance, to the choice-of-law principles outlined in the Restatement." *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001).

**[2]** California's codified choice-of-law rules provide that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does

not indicate a place of performance, according to the law and usage of the place where it is made." Cal. Civ. Code § 1646. If Bassidji's assertions are correct and the second guarantee was executed in Hong Kong, the California rule suggests that Hong Kong law applies, at least as to that guarantee, as no place of performance is indicated.

[3] There is an exception to the California rule, however, when courts are called upon to enforce a contract that implicates strong public policy concerns. "California's narrow, public policy exception to the resolution of conflicts through a neutral comparison of government interests . . . applies only when foreign law is 'so offensive to [California] public policy as to be " 'prejudicial to . . . recognized standards of morality and to the general interest of the citizens. . . .' " ' " *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1423 n.8 (9th Cir. 1989) (quoting *Wong v. Tenneco, Inc.*, 702 P.2d 570, 576 (Cal. 1985) (quoting *Knodel v. Knodel*, 537 P.2d 353, 361 n.15 (Cal. 1975) (quoting *Biewend v. Biewend*, 109 P.2d 701, 705 (Cal. 1941)))) (alteration and second omission in original)). Illegal trade with Iran, a country whose government poses an "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," *see* Order pmbl., represents just this sort of policy concern. California law, which incorporates Executive Order 13,059 through the Supremacy Clause, therefore applies to both the California guarantee and the similar Hong Kong guarantee.[8] *See Kashani v. Tsann Kuen China Enter. Co.*, 13 Cal. Rptr. 3d 174, 181 (Ct. App. 2004) (recognizing that "California law includes federal law" for purposes of choice-of-law analysis, so that "a violation of federal law is a violation of law for purposes of determining whether or not a contract is unenforceable as contrary to the public policy of California").

---

[8]A similar result would obtain if we applied federal choice-of-law principles. Federal common law follows the Restatement (Second) of Conflict of Laws, which also provides for a public policy exception. *See Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(b).

## II.   The Executive Order

**[4]** Executive Order 13,059 prohibits, among other things:

> any transaction or dealing by a United States person, wherever located, including purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing, in or related to: (i) goods or services of Iranian origin or owned or controlled by the Government of Iran[.]

Order, § 2(d) & d(i).

**[5]** The interpretation of section 2(d) is an issue of first impression in the federal courts. As is true of interpretation of statutes, the interpretation of an Executive Order begins with its text. *See United States v. Hassanzadeh,* 271 F.3d 574, 580 (4th Cir. 2001). The text must be construed consistently with the Order's "object and policy." *Northwest Forest Res. Council v. Glickman*, 82 F.3d 825, 830 (9th Cir. 1996) (quoting *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389 (9th Cir. 1994)) (internal quotation marks omitted).

**[6]** The text of section 2(d) plainly prohibits Goe's conduct. The Artemia cysts were "goods . . . of Iranian origin," and the guarantee covered costs incurred in harvesting them. The transaction between Arshian and Goe was certainly "related to" the brine shrimp eggs; the only reason for the transaction was to facilitate their harvesting.[9] Goe's "guaranteeing" of financial repayment is explicitly included as a type of "transaction or dealing" prohibited by section 2(d).

---

[9]In addition, the provision of harvesting licenses and customs clearances could well be viewed as "services owned or controlled by the government of Iran." We need not so decide, however, as section 2(d) applies whether or not one accepts the characterization of governmental licenses and clearances as "services."

In response to this textual analysis, Bassidji argues that the Executive Order is simply too broad to permit a literal interpretation. Bassidji contends, for example, that if an American in Hong Kong purchased soup containing Iranian shrimp, that conduct would fall within section 2(d). Bassidji is incorrect. The Iranian Transactions Regulations, 31 C.F.R. pt. 560, promulgated under the authority of the Executive Order,[10] carve out exceptions for personal expenses related to travel within a foreign country, "including payment of living expenses and acquisition of goods or services for personal use." 31 C.F.R. § 560.210(d). Similarly, the suggestion at oral argument that a broad reading of the Order would forbid transportation companies to carry a carpet of Iranian origin from one place to another within the United States is inconsistent with the implementing regulations. *See id.* § 560.518(a) ("Except for transactions involving the Government of Iran, all domestic transactions with respect to Iranian-origin goods located in the United States are authorized . . . ." (exception not here pertinent omitted)).

Apparently unaware of the limitations incorporated in the implementing regulations, the district court followed a limiting principle of its own. The court concluded that the Executive Order bans only transactions facilitating conduct, such as the importing of goods or services, otherwise banned by the Order.

The district court's interpretation is not only unnecessary for addressing concerns about *de minimis* application of the Order, given the regulations, but also in tension with the overarching purpose of the Executive Order. Limitation of "imports" and "exports" under sections 1 and 2(a) is but a means toward the larger end of exerting economic pressure on Iran.

---

[10]Sections 1 and 2 of the Executive Order both qualify their prohibitions with: "Except to the extent provided . . . in regulations, orders, directives, or licenses issued pursuant to this order." Section 5 authorizes the Secretary of the Treasury to promulgate regulations implementing the Order.

Overall, these sanctions aim to induce Iran's government to reduce the threat that, according to the Executive Order, Iran poses to United States interests. *Cf. Hassanzadeh,* 271 F.3d at 579 (violating the Order's import restrictions on Iranian goods is harmful because of the "[c]ontribution of financial support to terrorism").

With this purpose in mind, sections 2(b)-(f) cannot be construed as merely implementing sections 1 and 2(a). Section 2(c), for example, which limits "investment" in Iran, does not exist merely to effectuate the prohibition on trade. Rather, the prohibition against investment goes to the heart of the economic sanctions regime. Investment in Iran directly aids the Iranian economy whether or not it ultimately leads to an exchange of goods between Iran and the United States. *See generally* Letter to Congressional Leaders on Prohibiting Certain Transactions with Respect to Iran, 1997 Pub. Papers 1113, 1114 (Aug. 19, 1997) (stating that the embargo prohibits "any trade- *or investment-related* activities with Iran" and "mak[ing] clear that this means *all direct or indirect involvement in such activities wherever those activities occur*" (emphasis added)).

Similarly, although the transaction that Goe guaranteed was not directly related either to the import or to the export of goods between Iran and the United States, it furthered a result inconsistent with the purposes of the Executive Order. The transaction promoted the transfer of wealth to Iran, including, it appears, the payment of fees to the Iranian government. That the licenses pertained to a business deal, the export of brine shrimp eggs from Iran to Hong Kong, that is not illegal under the Executive Order, is irrelevant. While the Executive Order does not, and could not, ban all trade between Hong Kong and Iran, *see* 50 U.S.C. § 1702(a)(1) (granting the President the authority under IEEPA to regulate trade only of persons "subject to the jurisdiction of the United States"), United States citizens are expressly prohibited from facilitating such

trade by guaranteeing the payment of costs incurred by parties to the sale. *See* Order § 2(d).

**[7]** We therefore reject the district court's limiting interpretation of the Executive Order. The guarantees, we conclude, violated both the text and the animating purpose of the Executive Order. On the facts before us, they were illegal.

## III. Enforcement of Illegal Guarantees

Goe contends that, as illegal contracts, the guarantees are unenforceable. We can reach this issue even though the district court certified for interlocutory appeal only the question of whether the guarantees violated the Executive Order. When reviewing a district court order certified under 28 U.S.C. § 1292(b), our jurisdiction "is not limited to deciding the precise question the district court certified to [us]. . . . [We] may address any issue fairly included within [the] order [we are reviewing]." *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1000 (9th Cir. 2001).

Here, the relevant district court order is the denial of Goe's motion to dismiss. The motion contended that the guarantees were illegal and therefore unenforceable; the district court denied the motion because it concluded that the guarantees did not violate the Executive Order. Any issue material to the effect of the illegality defense on the propriety of dismissing the action is "fairly included" within the certified order. The question of enforceability is critical to determining the validity of the district court's denial of the motion to dismiss, as the district court recognized when it decided that question in its order certifying the interlocutory appeal.

A threshold question is whether California or federal law should apply to the enforceability question. This suit is a breach of contract action, with our jurisdiction premised solely on diversity of citizenship under 28 U.S.C. § 1332. The question whether a particular agreement is enforceable is one

of substance, not procedure. Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), the law of the forum state, California, would normally apply.

In this case, however, Goe raises a federal law claim as a defense. While we recognize that federal law governs whether the transaction between Goe and Arshian was illegal, the enforceability of the illegal guarantees under general principles of contract law is a separate question. Courts have reached divergent conclusions concerning which law should be applied to determine enforceability in these circumstances.

*Kelly v. Kosuga*, 358 U.S. 516 (1959), stated, flatly, that the "effect of illegality under a federal statute is a matter of federal law, even in diversity actions in the federal courts after *Erie*." *Id.* at 519 (citation omitted); *see also Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176 (1942) ("When a federal statute condemns an act as unlawful[,] the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted."). The Seventh Circuit has held, relying on *Kelly*, that "[w]hen the statute is federal, federal law determines not only whether the statute was violated but also, if so, and assuming the statute itself is silent on the matter, the effect of the violation on the enforceability of the contract." *N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986).

This principle, however, has either been honored in the breach, or has come to encompass a corollary permitting the incorporation of the law of the forum state in some circumstances. In *Torrez v. Torrez* (*In re Torrez*), 827 F.2d 1299 (9th Cir. 1987), for example, without discussing the possibility of applying federal law, we applied California law to the question whether to enforce a contract that violated federal statutory dictates concerning subsidized irrigation water.[11]

---

[11]*Torrez* presented the enforceability question in the bankruptcy context and involved real property located in California. *See* 827 F.2d at 1299.

Similarly, a recent California Court of Appeal decision applied California law in determining the scope of the illegality defense as it relates to the same Executive Order here at issue, also without alluding to *Kelly* or *Sola*. *See Kashani*, 13 Cal. Rptr. 3d at 179-81.

In this case, the result does not turn on whether we apply federal or state law, so we need not decide whether *Kelly* and *Sola* govern. Both federal law and California law begin from the core proposition that whatever flexibility may otherwise exist with regard to the enforcement of "illegal" contracts, courts will not order a party to a contract to perform an act that is in direct violation of a positive law directive, even if that party has agreed, for consideration, to perform that act.

The Supreme Court in *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982), stated this bedrock principle emphatically, stressing the difference between cases in which the courts are asked to order an illegal act and cases in which the relief sought does not seek directly to order illegal activity. *Id.* at 79-80. The Court recognized that there is considerable room for the balancing of equitable considerations in pursuit of the " 'overriding general policy . . . "of preventing people from getting other people's property for nothing when they purport to be buying it.' ' "' *Id.* at 80 (quoting *Kelly*, 358 U.S. at 520-21 (quoting *Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 271 (1909) (Holmes, J., dissenting))). *Kaiser Steel* made clear, however, that the realm of nuanced judicial determinations concerning enforcement when an illegality defense is asserted only begins "*[p]ast the point* where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act." *Id.* (quoting *Kelly*, 358 U.S. at 520) (internal quotation marks omitted) (alteration in original) (emphasis added). Where the relief sought does *not* pass that point — that is, where a promise can only "be enforced [by] commanding unlawful conduct," *id.* at 79 — then the principle that "illegal promises will not be enforced in cases controlled by the federal law," *id.* at 77, takes center

stage and does not admit of exceptions. *See also id.* at 81-82 (emphasizing that federal courts' authority to enforce agreements against public policy is "subject to the limitation that the illegality defense should be entertained in those circumstances where its rejection would be to enforce conduct that the . . . laws forbid").

Applying that core principle, *Kaiser Steel* first assumed the invalidity under the antitrust laws and § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), of a collective bargaining agreement between Kaiser Steel and a union representing its employees. The agreement required Kaiser Steel to pay a penalty into the union trust funds for any coal purchased from employers who were not making contributions to the funds on their employees' behalf. The Court then held that the purchased coal clause was unenforceable even after the collective bargaining agreement had expired and all work under it had been done, even though the agreement contained a clause providing for renegotiation at the behest of the union in the event the purchased coal clause was deemed illegal. *Id.* at 74-82. The reason for abjuring reliance on equitable considerations and permitting what was arguably a windfall to Kaiser Steel, the Court made clear, was that:

> If Kaiser's undertaking is illegal under the antitrust or the labor laws, it is because of the financial burden which the agreement attached to purchases of coal from non-UMW producers, even though they may have contributed to other employee welfare funds. It is plain enough *that to order Kaiser to pay would command conduct that assertedly renders the promise an illegal undertaking under the federal statutes.*

*Id.* at 79 (emphasis added).

That *Kaiser Steel* establishes a limiting principle, not a general pronouncement about the enforceability through damages

awards or otherwise of agreements in some respects illegal, has sometimes been overlooked. *See, e.g.*, *Nagel v. ADM Investor Servs., Inc.*, 217 F.3d 436, 440 (7th Cir. 2000) (stating that despite *Kaiser Steel*'s "ringing declaration, many cases continue to treat the defense of illegality to the enforcement of a contract as presumptive rather than absolute, forgiving minor violations and not allowing the defense to be used to confer windfalls" (citing cases)); *Paul Arpin Van Lines, Inc. v. Universal Transp. Servs., Inc.*, 988 F.2d 288, 290 (1st Cir. 1993) ("This general rule [of not enforcing illegal contracts] . . . is almost as much honored in the breach as in the observance."). Nuanced approaches to the illegal contract defense, taking into account such considerations as the avoidance of windfalls or forfeitures, deterrence of illegal conduct, and relative moral culpability, remain viable in federal court and represent no departure from *Kaiser Steel*, but only as long as the relief ordered does not mandate illegal conduct. *See N. Ind. Pub. Serv. Co.*, 799 F.2d at 272-73 (applying an equitable, balancing approach, while recognizing that "where the contract itself is illegal — as it would be if it were . . . a violation of section 1 of the Sherman Act, or a contract to commit a bank robbery" — it would be "governed by *Kaiser Steel*"); *Nat'l Souvenir Ctr. v. Historic Figures, Inc.*, 728 F.2d 503, 515 (D.C. Cir. 1984) (explaining that *Kaiser Steel* prevents courts from enforcing contracts where doing so would make them "effectively become a party to the allegedly illegal scheme"); *Transfair Int'l, Inc. v. United States*, 54 Fed. Cl. 78, 84-85 (2002) (relying on the Restatement (Second) of Contracts, Chapter 8); *cf. United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 174 (9th Cir. 1996) (noting that courts will not enforce an arbitration award when it violates a public policy that is explicit, well-defined, dominant, and "one that specifically militates against the relief ordered by the arbitrator" (internal quotation marks and citations omitted)).

California law is similar. Under California law, "the general rule [is] that the courts will deny relief to either party who

has entered into an illegal contract or bargain which is against public policy." *Tri-Q, Inc. v. Sta-Hi Corp.*, 404 P.2d 486, 496 (Cal. 1965). Thus, while "[i]n situations in which no strong objections of public policy are present, a party to the illegal agreement may be permitted to enforce it," 1 B.E. WITKIN, SUM-MARY OF CALIFORNIA LAW § 451, at 401-02 (9th ed. 1987 & Supp. 2004), and the California courts will therefore give con-tractual remedies where an agreement is asserted to be illegal in a wide variety of circumstances, *see, e.g.*, *M. Arthur Gens-ler, Jr., & Assocs. v. Larry Barrett, Inc.*, 499 P.2d 503, 508 (Cal. 1972), California courts will not "fashion an equitable remedy" where doing so involves "enforcing the precise con-duct made unlawful . . . in contravention of the legislative purpose," *Joe A. Freitas & Sons v. Food Packers, Processors & Warehousemen Local 865*, 211 Cal. Rptr. 157, 162 (Ct. App. 1985) (citing *Kaiser Steel*, 455 U.S. at 84); *see also Wong*, 702 P.2d at 576 ("As this court emphasized in [*Lee On v. Long*, 234 P.2d 9, 11 (Cal. 1951)], a case in which a group of gamblers unsuccessfully sought to recover the spoils of their illicit activities: 'No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out . . . .' " (fur-ther internal quotation marks omitted)).

Illustrative is *Kashani*, a recent California Court of Appeal case concerning an illegality defense under the same Execu-tive Order here at issue. *Kashani* recognized a wide variety of circumstances in which California courts will indeed give force to contracts that are in some respect illegal, listing, among other "exceptions to the statutory and judicial lan-guage that illegal contracts are void and unenforceable," such considerations as unjust enrichment, imposition of a harsh penalty, interpretation of statutory penalties to exclude the illegality defense, lack of serious moral turpitude, termination of the agreement, and whether the underlying policy would be better served by enforcement. *See Kashani*, 13 Cal. Rptr. 3d at 180. At the same time, *Kashani* recognized the core princi-ple that courts may not themselves order violations of the law,

citing to and quoting from *Wong v. Tenneco*. *Id.* at 179. *Kashani* concluded that none of the available equitable considerations was sufficient to justify enforcement, given the strength of the public interest underlying the Executive Order and the "patently illegal contracts" at issue. *Id.* at 193.

We therefore proceed to examine whether, given the facts alleged in the complaint, a plausible remedy exists for Bassidji that would not require a court to order a legal violation.

## IV.   The Legality of a Damages Remedy

**[8]** Federal and California law, as explicated above, would bar an American court from ordering Goe to pay Arshian pursuant to the illegal guarantees. Such a payment would violate the precise terms of the Executive Order, which prohibit "any transaction or dealing by a United States person . . . related to . . . goods or services of Iranian origin" and "any new investment by a United States person in Iran." Order § 2(d) & d(i), (c). A payment from Goe to Arshian would provide funds to the Iranian economy, paying for goods in Iran. As such, it would violate both the letter of the Executive Order and its fundamental purposes.

That a court-ordered payment from Goe to Arshian would violate the Executive Order is supported by the inclusion in 31 C.F.R. § 560.510 of special authorization for licensing of *certain* damages awards by courts and other tribunals that would otherwise violate the Executive Order. The regulation allows "specific licenses [to] be issued on a case-by-case basis" for "transactions in connection with . . . awards, orders, or decisions of an administrative, judicial or arbitral proceeding in the United States or abroad, where the proceeding involves the enforcement of awards, decisions or orders of [the Iran-United States Claims Tribunal in The Hague, the International Court of Justice, or other international tribunals]." 31 C.F.R. § 560.510(a); *see also id.* § 560.510(d) & (d)(1) ("The following are authorized: All transactions related

to payment of awards of the Iran-United States Claims Tribunal in The Hague against Iran."). It also permits "[a]ll transactions necessary to the payment and implementation of awards . . . in a legal proceeding to which the United States Government is a party, or to payments pursuant to settlement agreements entered into by the United States Government in such a legal proceeding." *Id.* § 560.510(d)(2). By authorizing courts to enforce some litigation remedies that would otherwise violate the Executive Order, this regulation suggests that, but for the exceptions listed, United States courts may not order, as remedies, payments of the type requested in this case, where the ensuing transaction would violate the Executive Order.

[9] Arshian's assignment of the guarantee to Bassidji does not change this straightforward application of *Kaiser Steel.* In general, an assignee does not sue in its own right, but rather stands in the shoes of its assignor. *See, e.g.*, *Misic v. Bldg. Serv. Employees Health & Welfare Trust*, 789 F.2d 1374, 1378 (9th Cir. 1986) (per curiam) (applying the principle under federal law); *see also Nat'l Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997) (applying California law). Bassidji explicitly accepts this general rule, stating in his brief:

> Mr. Goe believes that an Iranian citizen could not secure justice in the United States courts without violating President Clinton's Executive Order; thus, he posits, an assignee cannot secure justice either.
>
> To the extent that Mr. Goe is simply reciting the general rule that an assignee stands in the shoes of his assignor, we wholly agree. But . . . the law does not in any way bar Mr. Arshian from appearing and seeking justice in the United States courts. It naturally follows that Mr. Arshian's assignee may also appear and seek justice.

**[10]** Thus, no damages remedy can be provided to Bassidji by an American court. The "shoes" in which he stands make his claim repugnant to the Executive Order. Goe could not be ordered to pay Arshian; therefore, a payment to Arshian's assignee is also prohibited.

## V. Further Proceedings

As this is an interlocutory appeal pursuant to the district court's certification under 28 U.S.C. § 1292(b), there has been no final judgment in the district court. We return the matter to the district court for further proceedings including, if necessary, consideration of whether Bassidji should be granted leave to amend. *See* FED. R. CIV. P. 15(a).

## Conclusion

For the reasons stated, we reverse the district court's determination that, on the facts pled, the guarantees were not covered by the Executive Order. Moreover, Bassidji's complaint does not state a claim for which recovery can legally be ordered.

**REVERSED.**

APPENDIX

Executive Order 13059 of August 19, 1997

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 *et seq.*) ("IEEPA"), the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*), section 505 of the International Security and Development Cooperation Act of 1985 (22 U.S.C. § 2349aa-9) ("ISDCA"), and section 301 of title 3, United States Code,

I, WILLIAM J. CLINTON, President of the United States of America, in order to clarify the steps taken in Executive Orders 12957 of March 15, 1995, and 12959 of May 6, 1995, to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States declared in Executive Order 12957 in response to the actions and policies of the Government of Iran, hereby order:

Sec. 1. Except to the extent provided in section 3 of this order or in regulations, orders, directives, or licenses issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, the importation into the United States of any goods or services of Iranian origin or owned or controlled by the Government of Iran, other than information or informational materials within the meaning of section 203(b)(3) of IEEPA (50 U.S.C. § 1702(b)(3)), is hereby prohibited.

Sec. 2. Except to the extent provided in section 3 of this order, in section 203(b) of IEEPA (50 U.S.C. § 1702(b)), or in regulations, orders, directives, or licenses issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, the following are prohibited:

(a) the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(i) such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(ii) such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran;

(b) the reexportation from a third country, directly or indirectly, by a person other than a United States person of any goods, technology, or services that have been exported from the United States, if:

(i) undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran, and

(ii) the exportation of such goods, technology, or services to Iran from the United States was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of the actions taken pursuant to the national emergency declared in Executive Order 12957; provided, however, that this prohibition shall not apply to those goods or that technology subject to export license application requirements if such goods or technology have been:

(A) substantially transformed into a foreign-made product outside the United States; or

(B) incorporated into a foreign-made product outside the United States if the aggregate value of such controlled United States goods and technology constitutes less than 10 percent of the total value of the foreign-made product to be exported from a third country;

(c) any new investment by a United States person in Iran or in property, including entities, owned or controlled by the Government of Iran;

(d) any transaction or dealing by a United States person, wherever located, including purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing, in or related to:

(i) goods or services of Iranian origin or owned or controlled by the Government of Iran; or

(ii) goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran;

(e) any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this order if performed by a United States person or within the United States; and

(f) any transaction by a United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order.

Sec. 3. Specific licenses issued pursuant to Executive Orders 12613 (of October 29, 1987), 12957, or 12959 continue in

effect in accordance with their terms except to the extent revoked, amended, or modified by the Secretary of the Treasury. General licenses, regulations, orders, and directives issued pursuant to those orders continue in effect in accordance with their terms except to the extent inconsistent with this order or to the extent revoked, amended, or modified by the Secretary of the Treasury.

Sec. 4. For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States;

(d) the term "Iran" means the territory of Iran and any other territory or marine area, including the exclusive economic zone and continental shelf, over which the Government of Iran claims sovereignty, sovereign rights, or jurisdiction, provided that the Government of Iran exercises partial or total de facto control over the area or derives a benefit from economic activity in the area pursuant to international arrangements;

(e) the term "Government of Iran" includes the Government of Iran, any political subdivision, agency, or instrumentality thereof, and any person owned or controlled by, or acting for or on behalf of, the Government of Iran;

(f) the term "new investment" means:

(i) a commitment or contribution of funds or other assets; or

(ii) a loan or other extension of credit, made after the effective date of Executive Order 12957 as to transactions prohibited

by that order, or otherwise made after the effective date of Executive Order 12959.

Sec. 5. The Secretary of the Treasury, in consultation with the Secretary of State and, as appropriate, other agencies, is hereby authorized to take such actions, including the promulgation of rules and regulations, the requirement of reports, including reports by United States persons on oil and related transactions engaged in by their foreign affiliates with Iran or the Government of Iran, and to employ all powers granted to me by IEEPA and the ISDCA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

Sec. 6. (a) The Secretary of the Treasury may authorize the exportation or reexportation to Iran or the Government of Iran of any goods, technology, or services also subject to export license application requirements of another agency of the United States Government only if authorization by that agency of the exportation or reexportation to Iran would be permitted by law.

(b) Nothing contained in this order shall be construed to supersede the requirements established under any other provision of law or to relieve a person from any requirement to obtain a license or other authorization from another department or agency of the United States Government in compliance with applicable laws and regulations subject to the jurisdiction of that department or agency.

Sec. 7. The provisions of this order consolidate the provisions of Executive Orders 12613, 12957, and 12959. Executive Order 12613 and subsections (a), (b), (c), (d), and (f) of section 1 of Executive Order 12959 are hereby revoked with

respect to transactions occurring after the effective date of this order. The revocation of those provisions shall not alter their applicability to any transaction or violation occurring before the effective date of this order, nor shall it affect the applicability of any rule, regulation, order, license, or other form of administrative action previously taken pursuant to Executive Orders 12613 or 12959.

Sec. 8. Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

Sec. 9. The measures taken pursuant to this order are in response to actions of the Government of Iran occurring after the conclusion of the 1981 Algiers Accords, and are intended solely as a response to those later actions.

Sec. 10. (a) This order is effective at 12:01 a.m. eastern daylight time on August 20, 1997.

(b) This order shall be transmitted to the Congress and published in the Federal Register.

/S/ WILLIAM J. CLINTON

THE WHITE HOUSE,

August 19, 1997.