**MORRIS–GRIFFIN CORPORATION,**
**Plaintiff,**

**v.**

**C & L SERVICE CORPORATION,**
**Defendant.**

**Civ. No. 2:10cv298.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 16, 2010.

Cathy Ann Hinger, Paul Arthur Kaplan, Womble Carlyle Sandridge & Rice PLLC, Washington, DC, Conrad Moss Shumadine, Willcox & Savage PC, Norfolk, VA, for Plaintiff.

Samuel Warrenton Meekins, Jr., John Frederick Sawyer, Wolcott Rivers Gates, Virginia Beach, VA, for Defendant.

## ORDER

ROBERT G. DOUMAR, District Judge.

This matter comes before the Court on a Motion for Temporary Restraining Order and Preliminary Injunction filed by Plaintiff Morris–Griffin Corporation ("MGC") on June 24, 2010. Plaintiff seeks to enjoin Defendant C & L Service Corporation ("CLS") from withholding payments allegedly due under the parties' subcontract agreement, and to require CLS to restore MGC's access to a joint account.

The Court finds that MGC and CLS deliberately procured a government contract that violated applicable federal regulations, including 13 C.F.R. § 125.6(a) and 13 C.F.R. § 121.103. The parties' current dispute is a direct result of these violations and of CLS' claimed efforts to bring the parties into compliance with applicable federal regulations. The Court cannot enforce the parties' subcontract, even though CLS through Barbara Moore, its principal officer, has blatantly violated the terms and conditions of the subcontract with MGC, for it is plainly contrary to law. *See Paul Arpin Van Lines, Inc. v. Universal Transp. Servs., Inc.,* 988 F.2d 288, 290 (1st

Cir.1993); *Smithy Braedon Co. v. Hadid,* 825 F.2d 787, 790 (4th Cir.1987). The Court further finds that MGC is barred from injunctive relief by the doctrine of unclean hands. *See Johnson v. Yellow Cab Transit Co.,* 321 U.S. 383, 387, 64 S.Ct. 622, 88 L.Ed. 814 (1944) ("[A] federal court should not, in an ordinary case, lend its judicial power to a plaintiff who seeks to invoke that power for the purpose of consummating a transaction in clear violation of law."); *United States v. Felici,* 208 F.3d 667, 670–71 (8th Cir.2000) ("The doctrine of unclean hands is an equitable doctrine that allows a court to withhold equitable relief if such relief would encourage or reward illegal activity."). Finally, the Court finds that the relief MGC requests goes beyond a mere injunction to preserve the *status quo,* and thus is not permitted under *Merrill Lynch v. Bradley,* 756 F.2d 1048 (4th Cir.1985). For these reasons, MGC's Motion for Temporary Restraining Order and Preliminary Injunction is hereby **DENIED.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

The federal government sets aside approximately one quarter of its annual procurement budget for the procurement of goods and services from small business concerns (SBCs). Many of these SBCs, standing alone, lack the resources or expertise to carry out these set-aside contracts. Accordingly, the government permits SBCs to team up with larger companies in order to perform their set-aside contracts. This case involves a dispute between a contractor and a subcontractor on an SBC set-aside contract.

### 1. The HUD Contract

MGC is a minority-owned firm with over twenty years of experience in the mortgage loan servicing business. (Compl. ¶ 18.) MGC's President is Theodore Griffin ("Griffin"). (Compl. ¶ 22.) Until 2007, MGC qualified as a "socially and economically disadvantaged" SBC under § 8(a) of the Small Business Act, 15 U.S.C. § 637(a). (Compl. ¶ 18–19; 21.) CLS is a minority-owned firm that qualifies as a socially and economically disadvantaged SBC under § 8(a). (Compl. ¶ 21.) CLS' President is Barbara Moore ("Moore"). (Compl. ¶ 22).

In 2003, the Department of Housing and Urban Development ("HUD") opened bidding on a loan servicing support services contract. (Compl. ¶ 19.) This contract was set aside for a socially and economically disadvantaged SBC. (*Id.*) MGC teamed up with First Madison Services, Inc. ("First Madison") and successfully bid on the contract. (*Id.*) MGC served as the prime contractor and the eligible socially and economically disadvantaged SBC, and First Madison provided the majority of the loan servicing support services. (*Id.*) The contract was apparently completed successfully.

In August 2007, HUD put the loan servicing contract up for rebidding. (Compl. ¶ 21.) By this time, MGC's revenues had grown to the point that it no longer qualified as a socially and economically disadvantaged SBC. (*Id.*) Griffin approached Moore about a joint MGC–CLS bid on the HUD contract. (Compl. ¶ 22.) Griffin knew Moore personally, and felt that he could work with her. (*Id.*) Griffin also felt that CLS "would not be a competitor to Morris–Griffin in the loan servicing field." (Griffin Test.) [1] In an echo of the prior

---

**1.** All citations to "Griffin Test." refer to Theodore Griffin's testimony at a preliminary in- junction hearing conducted on July 7–8, 2010.

arrangement between MGC and First Madison, the parties agreed that CLS would serve as the prime contractor and the qualifying SBC, and MGC would serve as a subcontractor and provide key services such as information technology ("IT") support. (Compl. ¶ 23.)

Notably, federal regulations place restrictions on SBC teaming agreements. In a set-aside service contract, at least fifty percent of all personnel costs must be incurred for payment of the SBC's employees. *See* 13 C.F.R. § 125.6(a). Additionally, a non-SBC subcontractor cannot perform the "primary and vital requirements of a contract," and the SBC cannot be "unusually reliant" on the subcontractor. *See* 13 C.F.R. § 121.103.

Flying directly in the face of these restrictions, MGC and CLS contemplated a business relationship in which MGC would take on a leading role. CLS had "no prior experience in the mortgage loan servicing industry and no capacity to provide the related and necessary IT or accounting services for HUD." (Compl. ¶ 22.) In fact, at the time, CLS was operating as a "janitorial and a maintenance firm." (Griffin Test.) Similarly, MGC "had the financial resources to fund the start-up of the HUD contract performance, while CLS did not." (*Id.*). The Small Business Administration (SBA) initially rejected the parties' bid based on CLS's lack of loan servicing experience and poor financial standing. (Compl. ¶ 24.) The SBA only reversed course after HUD's contracting officer

called and expressed "confidence in MGC's capabilities based on its performance of the prior contract." (*Id.*)

HUD ultimately awarded the contract to CLS in September 2007. The contract between HUD and CLS (the "HUD Contract") is a fixed-price, one-year contract commencing on October 1, 2007, subject to options for renewal by HUD. (Compl. ¶ 25.) It has been renewed twice. (*Id.*)

Unsurprisingly, MGC provided "the bulk of the human and financial capital needed to execute the HUD Contract." (Compl. ¶ 29.) MGC is currently the sole signatory on a number of important third-party contracts, including a lease for a loan servicing center in Tulsa, Oklahoma. (Compl. ¶ 30.) MGC also paid for the computer servers, network hardware, and software needed to perform the HUD Contract. (*Id.*)

### 2. The Subcontract

The relationship between MGC and CLS is governed by a Subcontract Agreement (the "Subcontract") that the parties entered into on December 28, 2007. (Compl. Ex. 1). Its relevant provisions can be summarized briefly. The Subcontract identifies MGC's President, Theodore Griffin, and CLS's President, Barbara Moore as "Key Personnel." (Compl. Ex. 1 at § 2.6.) These Key Personnel are responsible for the "development, adoption and implementation of organizational policies and procedures regarding the" services provided under the HUD Contract.[2] (*Id.*)

---

**2.** Quoted in full, § 2.6 of the Subcontract provides as follows:

> *Subcontract Management.* The day-to-day administration of this Agreement shall be by the Contract Manager as set forth in the Contract or as adjusted from time-to-time by the Parties with the consent of the Client [HUD]. General oversight of the Services, and the development, adoption and implementation of organizational policies and procedures regarding the Services shall be

> the responsibility of the following persons, who are designated as Key Personnel for purposes of this Agreement: Barbara Moore and Theodore Griffin. The Key Personnel shall meet monthly, in person or telephonically. The unanimous agreement of the Key Personnel shall be necessary for any decision to be made or action to be taken by the Key Personnel under this Agreement.
> (Compl. Ex. 1).

Payments accruing from HUD must be deposited in a "Contractor Master Account," a Wachovia bank account. (*Id.* § 3.2.2.) Signed approval from both Key Personnel is required for any disbursement of funds from the Contractor Master Account.

For purposes of the present dispute, one of the most important provisions in the Subcontract is its budgeting provisions. Under the Subcontract, payment of monthly costs and expenses must be made in accordance with an approved budget, unless otherwise approved by the Key Personnel. (Compl. Ex. 1 at §§ 3.1.1, 3.1.2.) At the end of the year, however, the parties can reconcile their actual expenses with the monthly payments made for the year. (*Id.* § 3.1.3.) To the extent that either party's actual costs exceed monthly payments, that party is entitled to payment from gross profits. (*Id.*) In other words, expenses in excess of budgeted amounts are not payable on a monthly basis without specific approval, but these expenses are payable at the end-of-the-year reconciliation.

One additional budgeting provision in the Subcontract bears mention. As noted previously, federal regulations require at least fifty percent of all personnel costs to be allocated for payment of SBC employees—in this case, CLS's employees. *See* 13 C.F.R. § 125.6(a). In a reflection of this requirement, the Subcontract contains a provision stating that CLS

> shall at all times during the term of the Contract bear responsibility for paying no less than fifty-one percent (51%) of all direct and indirect costs and expenses incurred in performing all services required under the Contract, and [MGC] shall bear responsibility for paying the remainder of such costs and expenses, and that the Budget shall at all times during the term of the Contract provide sufficient funds from the

> Contractor Master Account to reimburse [MGC] for all of such costs and expenses.

(Compl. Ex. 1 at § 3.1.6).

The Subcontract contains a detailed procedure for dispute resolution. The Subcontract is "governed by and construed in accordance with all applicable federal laws and regulations, and, to the extent applicable, the laws of the Commonwealth of Virginia." (Compl. Ex. 1 at § 12.12.) The "Parties agree that if any dispute arises under [the Subcontract], they will" first attempt to resolve their dispute through mediation. If mediation proves unsuccessful, the "Parties agree that the dispute shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. . . ." (Compl. Ex. 1 at 22–23.)

### 3. The Parties' Dispute

The parties' dispute began in December 2008, approximately one year after the execution of the Subcontract. At that time, MGC submitted a reconciliation invoice in the amount of $2,175,393.92. (Compl. Ex. 2.) To put this number in perspective, MGC's total expenses for the following year, 2009, totaled $6,848,668.23. CLS initially refused to pay this invoice, and retained an accounting firm to review the invoice. (Compl. ¶ 46.) Although CLS ultimately paid the reconciliation invoice, the parties' relationship deteriorated rapidly. CLS refused to approve MGC's proposed 2009 budget, arguing that MGC's expenses were too high. Additionally, CLS ceased paying MGC's monthly invoices in full. (Compl. Ex. 2.) Between January 2009 and December 2009, MGC submitted invoices for $6,948,668.23. (*Id.*) CLS authorized payment of only $6,003,606.14, creating a shortfall of $945,062.09. (*Id.*) CLS justified its refusal to pay on the grounds that

MGC's 2009 budget was never approved. (Compl. ¶ 45.)

CLS continued its efforts to rein in MGC's costs in 2010. In 2010, CLS began requiring MGC "to produce extensive documentation, to its satisfaction, as a precondition to receiving the monthly payments due" under the Subcontract. (Compl. ¶ 50.) On March 25, 2010, CLS informed MGC that it would henceforth limit reimbursement of MGC's costs and expenses at a fixed percentage amount. (Compl. ¶ 52). Between January 2010 and April 2010, MGC submitted invoices in the amount of $2,459,695.95. CLS has only authorized payment for $1,866,000. The overall shortfall is now in the amount of $1,539,758.04. (Compl. Ex. 2).

CLS, through Moore, also began to cut MGC out of the HUD contract. On October 1, 2009, CLS entered into a subcontract with a third-party IT support company, Informational Engineering Service Inc., for the provision of IT support services. (Compl. ¶ 63.) CLS through Moore for CLS did not comply with its agreement and obtain approval from MGC before entering into the contract with Informational Engineering Service Inc. (Compl. ¶ 64.) Notably, the MGC–CLS Subcontract provides that "[a]pproval of Key Personnel must be obtained before any Party may further subcontract to a third-party ... under the Agreement." (Compl. Ex. 1 at § 2.9.1.)

On March 15, 2010, CLS sent HUD a letter stating that "Theodore M. Griffin, President of Morris–Griffin Corporation, is hereby removed as a Project Director of the above-referenced contract because he does not have the authority to negotiate, execute or make any decision as it relates to his contract for C & L Service Corporation." (Compl. Ex. 4.) MGC appointed Karen Moore Christmas to replace Mr. Griffin. (*Id.*). Ms. Christmas is the daughter of MGC's President, Barbara Moore. (Compl. ¶ 56.) Although Ms. Christmas has a bachelor's degree in Business Administration, she also has a "school teacher's background and no experience with mortgage loan servicing, IT or administering government contracts." (*Id.*; Compl. Ex. 4.) This again violated the terms of the MGC–CLS Subcontract.

On June 1, 2010, CLS issued a directive appointing Joe Person, a CLS employee, to serve as an "on-site IT Manager" at the parties' loan-servicing center in Tulsa, Oklahoma. (Compl. ¶ 57.) The directive also stated that Mr. Person should be given "Administrator" security access to the center's computer servers. (*Id.*) MGC refused to accept Mr. Person's reassignment. (Compl. ¶ 58.) CLS responded through its attorney, Eddie Garcia, with a letter threatening to completely terminate "the IT services provision of the CLS–MGC Subcontract." (Compl. ¶ 59.) CLS also allegedly contacted HUD, criticized MGC's performance of the IT portion of the subcontract, and sought HUD's concurrence regarding Mr. Person's appointment and security clearance. (Compl. ¶ 61.) The matter was ultimately dropped after MGC contacted HUD and defended the performance of its IT department. (Compl. ¶ 62.) The Court finds that CLS was proceeding on a course to squeeze out MGC.

### 4. Procedural Background

MGC invoked the dispute resolution procedures set forth in Article XI of the Subcontract in September 2009. (Compl. ¶ 66.) The parties went to mediation on December 15, 2009. (*Id.*) According to MGC, "it appeared to all, including the mediator, that virtually all of the disputes pending between the parties had been resolved as a result of a one-on-one meeting that took place between Ms. Moore and Mr. Griffin at the end of the mediation session." (*Id.*) MGC alleges, however, that

CLS failed to uphold the agreement struck at the mediation. (Compl. ¶ 67.) Accordingly, MGC filed a Demand for Arbitration with the American Arbitration Association on March 16, 2010.

After the Demand for Arbitration was filed, CLS "professed to be interested in engaging in a good faith effort to resolve the parties' disputes through a negotiation process, with the participation of a third-party neutral, leaving a formal, binding arbitration only as a resolution of last resort that ought to be avoided." (Compl. ¶ 70.) MGC has been dissatisfied with CLS's participation in these negotiations, however. MGC states that "CLS is engaging in various dilatory tactics with respect to mediation and arbitration, CLS has continued to choke off the flow of funds to MGC, has wrongfully added conditions upon the payment of funds, has disparaged MGC to HUD, has engaged in other, improper unilateral actions, and has made threats to substantially reduce or eliminate altogether MGC's role under the HUD Contract." (Compl. ¶ 72.) According to the parties, the arbitration is currently scheduled for mid-November.[3] It would appear that CLS has purposefully delayed the arbitration proceeding.

On June 24, 2010, MGC filed the instant Motion for Preliminary Injunction and Temporary Restraining Order. MGC seeks the following relief:

Plaintiff Morris–Griffin Corporation respectfully requests that the Court enter an Order, temporarily and preliminarily:

a. enjoining CLS from withholding payment of MGC's May 2010 invoice;

b. enjoining CLS from withholding any other payments due to MGC under the Subcontract which MGC will continue to request by monthly invoices pending the arbitration;

c. restoring the status quo ante by requiring CLS to add MGC as joint account holder of Wachovia Bank Account No. 2000026610100 and restoring MGC's electronic access to that account;

d. enjoining CLS from making any unilateral decisions under the HUD Contract without consent or approval of MGC, as required by Section 2.6 of the Subcontract;

e. enjoining CLS from taking any actions outside the ordinary course of performance of the Subcontract, including, but not limited to communicating unilaterally and without consultation, with HUD, with regard to MGC's performance;

f. taxing all costs of this action against CLS and awarding them to Morris–Griffin Corporation; and

g. granting Morris–Griffin Corporation such other and further relief that the Court finds is just and proper, including, but not limited to its attorneys fees, costs, and other expenses.

(Pl.'s Mot. for Prelim. Inj. At 1–2.)

CLS filed a Memorandum in Opposition on July 6, 2010. CLS argues that its "actions are founded not only upon the contract, but upon the requirement to comply with federal law." (Def.'s Mem. in Opp. to Pl.'s Mot. for Prelim. Inj. at 4.) Specifically, CLS argues that a "fundamental requirement of Section 8(a) government contracts is the 51% Rule found at 13 CFR 125.6." According to CLS, "MGC continues to demand payment for costs and expenses far in excess of 49% . . . . MGC's demands for payment have exceeded 70% in some instances." (*Id.* at 3–4.) CLS also asserts that MGC "has no underlying equitable cause of action upon which

---

3. Since arbitration is currently scheduled, the Court finds MGC's request for an Order Compelling Arbitration to be **MOOT**.

it can base its request for a preliminary injunction." (*Id.* at 6.) Finally, CLS claims that MGC "has breached the payment requirements, hiring of third-party requirements, IT requirements, and 51% Rule." (*Id.* at 12.)

The Court held a hearing on MGC's Motion on July 7, 2010 and July 8, 2010. The Court received evidence and heard extensive testimony from MGC's President, Theodore Griffin. Based on this evidence and testimony, the Court privately expressed its concern about the legality of the parties' dealings to counsel and to Griffin and Moore. The Court further expressed its reluctance to issue an order that might jeopardize the continued performance of the HUD Contract and the parties' ability to procure future government contracts. The Court advised the parties to settle this matter without further judicial intervention, and continued the hearing until July 26th, 2010. On July 23, 2010, by the agreement of both parties, the Court further continued this matter until August 12, 2010. On August 12, 2010, the parties appeared before the Court and represented that they were unable to settle their dispute.

## II. LEGAL STANDARD

The parties agree that their dispute is subject to mandatory arbitration. In the Fourth Circuit, a district court may enter a preliminary injunction to preserve the *status quo* pending arbitration. *Merrill Lynch v. Bradley*, 756 F.2d 1048 (4th Cir. 1985). Specifically, the Fourth Circuit held in *Bradley* that

> where a dispute is subject to mandatory arbitration under the Federal Arbitration Act, a district court has the discretion to grant a preliminary injunction to preserve the status quo pending the arbitration of the parties' dispute if the enjoined conduct would render that process a "hollow formality." The arbitration process would be a hollow formality

where "the arbitral award when rendered could not return the parties substantially to the *status quo ante.*"

*Id.* at 1053–54 (quoting *Lever Brothers Co. v. Int'l Chem. Workers Union*, 554 F.2d 115, 123 (4th Cir.1976)) (emphasis added).

Until 2008, the Fourth Circuit followed the four-factor *Blackwelder* test in determining whether a preliminary injunction should be granted. These factors were: "1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is not granted; 2) the likelihood of harm to the defendant if the preliminary injunction is granted; 3) the likelihood that plaintiff will succeed on the merits; and 4) the public interest." *Hughes Network Sys., Inc. v. InterDigital Comms. Corp.*, 17 F.3d 691, 693 (4th Cir.1994) (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977)). The first two factors were "the two most important factors," and interim injunctive relief could be granted if the balance of these factors weighs in favor of the plaintiff, even if "grave or serious questions are presented for ultimate decision." *Darr v. Massinga*, 838 F.2d 118, 120 (4th Cir.1988).

In 2008, however, the Supreme Court clarified the standards for injunctive relief in *Winter v. NRDC. Winters* emphasized that "injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," overruling a more permissive standard employed by the Ninth Circuit. 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). In light of the Court's ruling in *Winters*, the Fourth Circuit has abandoned the *Blackwelder* test and held that to obtain a preliminary injunction, a plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4]

that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008); *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (2009); *Allegra Network LLC v. Reeder*, No. 1:09cv912, 2009 WL 3734288 (E.D.Va. Nov. 4, 2009) (slip op.).

## III. ANALYSIS

■ Before reaching the merits of MGC's Motion for Temporary Restraining Order and Preliminary Injunction, the Court must determine whether MGC's Motion calls for the enforcement of an illegal contract. A district court "has a duty to determine whether a contract violates federal law before enforcing it." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). For the reasons set forth herein, the Court finds that it cannot grant the relief that MGC requests without also enforcing an unlawful contract. The Court further finds that the Subcontract is unenforceable as it is contrary to public policy, it is an agreement in furtherance of an unlawful purpose, and an agreement that the parties were not authorized to enter into. The Court further finds that MGC's claim is barred by the doctrine of unclean hands, based on the illegality of the underlying transaction and MGC's bad faith towards HUD. Finally, the Court finds that much of the relief that MGC requests is improper under *Merrill Lynch v. Bradley*, 756 F.2d 1048 (4th Cir. 1985).

### 1. MGC's Claim Calls for the Enforcement of an Illegal Contract

■ As a general rule, a federal court cannot enforce an otherwise valid contract that is "made in derogation of statutes designed to protect the public." *Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 790 (4th Cir.1987) (citing 6A A. Corbin, Corbin on Contracts § 1512, at 711 (1962); III S. Williston, Williston on Contracts § 1630, at

2865–66 (1920)); *see also Paul Arpin Van Lines, Inc. v. Universal Transp. Servs., Inc.*, 988 F.2d 288, 290 (1st Cir.1993) (collecting cases and noting that contracts in violation of an applicable regulation are also unenforceable). "Even in diversity actions, the effect of an act made illegal by a federal statute is to be decided by federal, not state, law." *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 14 (4th Cir.1971).

■ The prohibition on the enforcement of illegal contracts is not limited to contracts that are unlawful on their face. A court cannot enforce a contract if "the judgment of the Court would itself be enforcing the precise conduct made unlawful" by statute or regulation, even if the underlying contract itself is not unlawful. *Kaiser Steel*, 455 U.S. at 80, 102 S.Ct. 851 (quoting *Kelly v. Kosuga*, 358 U.S. 516, 520, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959)). Thus, for example, a court cannot enforce a contract for motor carrier services if the motor carrier does not have a license to perform those services. *Paul Arpin*, 988 F.2d at 290. *See also Bassidji v. Goe*, 413 F.3d 928, 935–939 (9th Cir.2005) (guarantee to reimburse party for licensing fees is unenforceable because licensing fees would be used to obtain and sell Iranian shrimp eggs in violation of executive order).

■ The Court finds that the restrictions on subcontracting contained in 13 C.F.R. § 125.6(a) and 13 C.F.R. § 121 were designed to protect the public. More specifically, the Court finds that these restrictions were designed to protect the public from fraud. The Small Business Act requires agencies to employ a variety of preference strategies to assist small businesses, in furtherance of Congress' declared policy to "promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals." 15

U.S.C. §§ 631(f)(2); 637(a). The subcontracting restrictions in 13 C.F.R. § 125.6(a) and 13 C.F.R. § 121 are intended to further this purpose and to protect the public from "ostensible subcontractors" who might fraudulently obtain small business preferences through the simple expedient of acting through a nominal § 8(a) contractor. As the United States Business Administration Office of Hearing and Appeals ("OHA") has stated, "[t]he purpose of the rule is to prevent other than small firms from forming relationships with small firms to evade SBA's size requirements." *Size Appeal of Public Comm. Servs.*, SBA No. SIZ–5008 (2008).

The Court further finds that the parties in the present case were not eligible for the HUD Contract under 13 C.F.R. § 125.6(a) and 13 C.F.R. § 121. Thus, the ultimate award of the HUD Contract was unlawful, and the parties' Subcontract was and is an agreement to carry out an unlawful contract. Furthermore, the parties continued to violate their legal agreement to comply with the terms of 13 C.F.R. § 125.6 even after they were awarded the HUD Contract. The Court reaches these conclusions after a careful review of the evidence in this case and applicable precedent.

Title 13 C.F.R. § 121.103(h) provides as follows:

> (4) A contractor and its ostensible subcontractor are treated as joint venturers, and therefore affiliates, for size determination purposes. An ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract, or of an order under a multiple award schedule contract, or a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract manage-ment, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

Because MGC did not qualify as a § 8(a) SBC, a finding of affiliation would have rendered the parties ineligible for the HUD Contract. *See* 13 C.F.R. § 121; Compl. ¶ 21.

There is no question that MGC was an "ostensible subcontractor" within the meaning of 13 C.F.R. § 121.103(h). To determine whether a small business is "unusually reliant" upon its subcontractors, the Small Business Administration employs a seven-factor test, looking to the following: (1) who will manage the contract; (2) which party possesses the requisite background and expertise to carry out the contract; (3) which party "chased the contract"; (4) what degree of collaboration was there on the bid; (5) are there discrete tasks to be performed by each party or is there a commingling of personnel and material; (6) what is the relative amount of work performed by each contractor; and (7) which party performs the more complex and costly contract functions. *C.F.S. Cargo, Inc.*, OHA No. 3434 (1991).

In the present case, six of the seven factors weigh heavily in favor of a finding of unusual reliance. First, the management of the contract was jointly split between Moore and Griffin. The Subcontract gave Griffin equal management rights. Griffin's agreement was required "for any decision to be made or action to be taken by the Key Personnel under [the Subcontract]." (Compl. Ex. 1 at § 2.6.) Four of the six key management personnel identified in the bid proposal were MGC

employees. To this day, MGC employs the majority of the supervisory personnel responsible for the day-to-day operation of the HUD Contract. (Griffin Test.)

Second, MGC plainly had the requisite background and expertise to carry out the contract. By MGC's own admission, CLS had "no prior experience in the mortgage loan servicing industry and no capacity to provide the related and necessary IT or accounting services for HUD." (Compl. ¶ 22.) In fact, in 2007, CLS was performing janitorial and maintenance services. (Griffin Test.) MGC, by contrast, had over twenty years of experience in the industry and was the incumbent contractor. (Compl. ¶¶ 18–21.)

Third, MGC was the party that "chased the contract." (Compl. ¶ 22.) Although several eligible § 8(a) contractors "sought Morris–Griffin to partner with them" to bid on the HUD Contract, Griffin instead chose to approach Moore. (Griffin Test.) Griffin candidly stated that one of the reasons that he chose to approach Moore was that "she would not be a competitor to Morris–Griffin in the loan servicing field." (*Id.*)

Fourth, the parties collaborated on the bid. Indeed, the bid was submitted jointly by MGC and CLS. (Compl. ¶ 23.) Mr. Griffin testified that CLS had "very little" role in the preparation of the response to HUD's solicitation. (Griffin Test.) The proposal repeatedly refers to MGC and CLS as a "team" or as "MGC–CLS." (Pl.'s Ex. 7.) Pointedly, MGC's logo is included on the cover of the proposal. (Pl.'s Ex. 7.)

Fifth, the parties contemplated a relationship in which MGC would perform a relatively large share of the contract. Under the Subcontract agreement, MGC could incur as much as 49% of all indirect costs and expenses—and, indeed, MGC would arguably be entitled to compensation for expenses in excess of this percentage. (Compl. Ex. 2 at § 3.1.3; § 3.1.6.) As a matter of practice, MGC provided "the bulk of the human and financial capital needed to execute the HUD Contract." (Compl. ¶ 30.) An expense report submitted by the parties at the hearing indicates that MGC has incurred approximately 60% of the labor costs in the first two years of the HUD Contract. (Ct. Ex. 1.)

Sixth, MGC was the party who would perform the more complex and costly contract functions. According to MGC, HUD understood that MGC—and not CLS— "would be providing the leadership and expertise necessary to fulfill the contract requirements." (Compl. ¶ 29.) Mr. Griffin testified that CLS "has the line staff basically," while MGC has "administrative staff or supervisors." (Griffin Test.) Griffin further testified that "ninety percent" of the IT staff on the HUD Contract are MGC employees. (Griffin Test.)

A review of applicable Office of Hearing and Appeals precedent confirms that the award of the HUD Contract violated the "ostensible subcontractor" rule. The present case is similar to *Size Appeal of Ahuska Int'l Security Corp.*, O.H.A. No. SIZ–2005–11–15–16, SIZ–4752 (Dec. 20, 2005). In *Ahuska*, the contractor (Ahuska) was a start-up company, and the subcontractor (USP) was a large incumbent firm. Ahuska's only prior experience was as a subcontractor for USP. Under the terms of their proposal, USP would perform all of the initial work under the contract, and gradually transition its workforce over to Ahuska. The parties projected that Ahuska would perform more than 50% of the contract over a five-year period, assuming that the contract was renewed four times.

The Office of Hearing and Appeals found that Ahuska and USP were affiliated, describing the case as a

"textbook" example of the factors listed in 13 C.F.R. § 121.103(g)(4) that should

lead to a determination of unusual reliance. For example, we have a neophyte prime who is wholly dependent upon its subcontractor, a prime who will perform much less than 50% of the work required by the contract, and a subcontractor that would be ineligible to submit an offer but for its teaming with the prime. Based upon these facts and the entire Record, I find, as a matter of law, that the Area Office had no alternative but to determine Appellant was unusually reliant upon USP as provided by 13 C.F.R. § 121.103(g)(4).

*Ahuska,* O.H.A. No. SIZ–2005–11–15–68 at 10. Notably, the O.H.A. specifically rejected the argument that the subcontractor's share of the work should be calculated over the multi-year term of the contract. *See id.* ("Appellant's argument ignores accepted contract law principles. The contract awarded as the result of the RFP does not include the option years until the CO gives the required notice and exercises the options (Fact 2).").

Although *Ahuska* is perhaps the closest parallel to the present case, there are numerous other O.H.A. decisions that would support a finding of affiliation under the present circumstances. *See, e.g. Size Appeal of CWU, Inc.,* SIZ–5118 (March 26, 2010) (finding affiliation where subcontract was incumbent, contract gave subcontract 49% of the work, parties did not delineate tasks that subcontractor would accomplish, and management employees of subcontractor would remain in their positions); *Size Appeal of A1 Procurement, LLC,* O.H.A. No. SIZ–5121 (Apr. 2, 2010) (subcontractor was affiliate where contractor had no relevant experience and lacked personnel capable of performing the contract, despite argument that contractor would hire capable personnel); *Size Appeal of J.W. Mills Mgmt.,* O.H.A. No. SIZ–4955 (May 21, 2008) (finding fact that contractor was start-up with no relevant experience or revenue and proffer of two of subcontrac-

tor's employees as "key personnel" were "strong indicators of unusual reliance"); *Size Appeal of TKTM Corp.,* O.H.A. No. SIZ–4885 (Jan. 31, 2008) (finding undue reliance where subcontractor had significant role in preparing bid, subcontractor would perform approximately 25% of work, and contractor emphasized subcontractor's capacity to complete project); *Size Appeal of SecTek, Inc.,* O.H.A. No. SIZ–4558 (May 14, 2003) (finding affiliation where "the whole tenor of the proposal is that of a team effort"); *Size Appeal of Business Control Systems, Inc.,* O.H.A. No. SIZ–3959 (1994) (affiliation found when the subcontractor's participation enhanced the competitive status of the proposal and the key employees including the Program Manager were the incumbent subcontractor's employees).

Based on the foregoing authorities and considerations, the Court finds that CLS and MGC were affiliates under 13 C.F.R. § 121. The Court also finds that parties failed to comply with the "50% Rule" contained in 13 C.F.R. § 125.6(a). Pursuant to 13 C.F.R. § 125.6(a), a contractor on a § 8(a) set-aside contract must agree to "perform at least 50 percent of the cost of the contract incurred for personnel with its own employees." MGC has submitted into evidence a letter from K.D. Bricker, a C.P.A. with Goodman & Company, LLP. (Pl.'s Ex. 10.) The letter indicates that after analyzing all the costs incurred by MGC between September 30, 2007 and December 31, 2009, Mr. Bricker concluded that "the actual costs incurred by C & L and MGC do *not* meet either the intent or letter of [the 50% rule], including, for the period from the inception of the HUD contract through FYE 12/31/2009." (Pl.'s Ex. 10 at 4.) Mr. Bricker's conclusion is borne out in the expense reports submitted by the parties, which indicate that MGC incurred approximately 62% of the parties' labor costs in fiscal year 2008 and

approximately 59% of the labor costs in fiscal year 2009. (*See* Ct. Ex. 1.) These facts demonstrate, beyond any reasonable argument, that the parties failed to comply with 13 C.F.R. § 125.6(a). *See Ahuska,* O.H.A. No. SIZ–2005–11–15–68 at 10.

For purposes of bidding on the HUD Contract, since it was clearly affiliated with MGC, CLS was an other-than-small business concern. *See* 13 C.F.R. § 121; Compl. ¶ 21. Yet CLS submitted an electronic certification falsely indicating that it was a small business concern for purposes of performing "other activities related to credit intermediation."[4] In this certification, CLS falsely represented that its was a "concern, *including its affiliates,* that … qualified as a small business under the criteria in 13 CFR part 121 and the size standard in paragraph (a) of this provision." (Emphasis added). These representations were false, and CLS acted with knowledge of its affiliation with MGC. CLS' fraudulent certification was incorporated by reference into the CLS–MGC bid on the HUD Contract, and was a necessary precondition to the ultimate award of the Contract. (*See* Pl.'s Ex. 7). Accordingly, the Court finds that the CLS–MGC bid was fraudulent at the time it was made.

The Court recognizes that CLS was ultimately awarded the HUD Contract. Presumably, the SBA could have rejected the parties' bid if it had found it to be illegal. It appears, however, that the SBA and HUD did not so much pass on the illegality of the parties' bid as disregard it altogether. Neither the SBA nor HUD has the authority to waive the regulations in 13 C.F.R. § 121 and 13 C.F.R. § 125.6(a), and their acceptance of the bid does not render it any less unlawful. In any event, the Court has been presented with certain facts that may not have been available to HUD when the parties submitted their bid. Specifically, the Court has heard testimony about how MGC "chased" the HUD Contract, has seen evidence of the expense and personnel breakdown between MGC and CLS, and has been given an opportunity to review the allegations in MGC's Complaint. If the issue were close, the Court might be more inclined to defer to the SBA's judgment as to the legality of the parties' bid.[5] But the issue is not close, and the Court could only disregard the illegality of the bid by deliberately closing its eyes to the overwhelming weight of the evidence.

The HUD Contract, an agreement conceived in fraud, is an illegal contract. From the start, it has been carried out in blatant violation of 13 C.F.R. § 121 and 13 C.F.R. § 125.6(a). To be sure, not every contract that is procured by fraud is *per se* illegal. But in the present case, the parties' fraudulent conduct relates directly to their noncompliance with applicable federal regulations. To date, the HUD Contract has been performed in willful disregard of federal acquisition regulations. Its continued performance flies in the face of these regulations. Under the circumstances, the Court finds that the HUD Contract is illegal.

MGC argues that even if the HUD Contract is illegal, the Subcontract agreement stands on its own as an enforceable bargain. The Court disagrees. Based on the evidence presented to the Court, it appears that MGC is seeking payment for personnel costs in excess of 50% of the cost of the HUD Contract. An order compelling CLS to make these payments

---

4. This certification is publicly available through the Online Representations and Certifications Application (ORCA) website at http://orca.bpn.gov.

5. The Court also places some weight on the fact that the SBA initially rejected the parties' bid, and only reversed itself under pressure from HUD. (Compl. ¶ 24.)

would effectively mandate a violation of 13 C.F.R. § 125.6(a). More generally, MGC seeks an order compelling CLS to maintain its undue reliance on MGC in violation of 13 C.F.R. § 121. The Court cannot and will not enforce a contract where its enforcement order would require a party to violate federal law. *See Kaiser Steel,* 455 U.S. at 80, 102 S.Ct. 851; *Bassidji,* 413 F.3d at 935–939; *Paul Arpin,* 988 F.2d at 290.

### 2. The Parties' Subcontract is Unenforceable

■ A government contract tainted by fraud or wrongdoing is void *ab initio. Godley v. U.S.,* 5 F.3d 1473, 1476 (Fed.Cir. 1993) (citing *J.E.T.S., Inc. v. United States,* 838 F.2d 1196, 1200 (Fed.Cir.1988)). In *J.E.T.S., Inc.,* a large business was awarded a contract after falsely certifying that it was eligible for a small-business set-aside. 838 F.2d at 1197–99. The Court of Federal Claims unequivocally ruled that the government contract was "void *ab initio,* like the government contracts held void because similarly tainted by a prohibited conflict of interest in *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), and *K & R Eng'g Co. v. United States,* 222 Ct.Cl. 340, 616 F.2d 469 (Ct.Cl. 1980)." The same result obtains in the present case. As demonstrated extensively above, the HUD Contract was tainted by fraud and wrongdoing from both parties. Accordingly, the HUD Contract was void *ab initio,* and is unenforceable. *See also Total Medical Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997).

■ The Court finds that the Subcontract is likewise unenforceable for three reasons. First, the Subcontract is unenforceable because it is against public policy. Congress has declared that it is a matter of public policy to "promote the business development of small business

concerns owned and controlled by socially and economically disadvantaged individuals." 15 U.S.C. § 631(f)(2). The Subcontract in question subverts this purpose by hindering CLS's control of an awarded § 8(a) contract and thus discouraging the professional development of a small business concerned owned and controlled by a socially and economically disadvantaged individual.

■ Second, the Subcontract is unenforceable because it is an agreement in furtherance of an unlawful purpose. An otherwise lawful agreement is unenforceable if it is intended to promote an unlawful purpose, "even though the performances bargained for are not in themselves illegal and even though in the absence of the illegal purpose the bargain would be valid and enforceable." *Sender v. Simon,* 84 F.3d 1299, 1308 (10th Cir.1996); *see also Cosmopolitan Financial Corp. v. Runnels,* 2 Haw.App. 33, 625 P.2d 390 (1981); *Nw. Amusement Co. v. Aetna Cas. & Sur. Co.,* 165 Or. 284, 107 P.2d 110 (1940). In the present case, the parties entered into a Subcontract agreement in furtherance of their unlawful performance of a set-aside HUD Contract. This fact renders the Subcontract unenforceable. *See Sender,* 84 F.3d at 1308.

Third, the Subcontract is unenforceable because the parties were not permitted by law to enter into such an agreement. Under applicable federal regulations, CLS could not be unduly reliant on MGC. 13 C.F.R. § 121. The Subcontract effectively required CLS to violate these regulations. As detailed more fully above, the Subcontract forced CLS to yield joint management to MGC and gave MGC a right to claim labor expenses in excess of 50%. This agreement was in direct violation of 13 C.F.R. § 121 and 13 C.F.R. § 125.6. "A court of law will not enforce an agreement which is illegal for the parties to make."

*Quinn v. Gulf & Western Corp.,* 644 F.2d 89, 94 (2d Cir.1981).

### 3. MGC's Claim for Injunctive Relief is Barred by the Doctrine of Unclean Hands

It is a fundamental principle of law that "he who seeks equity must do equity." *Bowen v. Hockley,* 71 F.2d 781, 783 (4th Cir.1934). This principle finds its expression in the doctrine of "unclean hands." "The 'unclean hands' doctrine 'closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'" *ABF Freight Sys., Inc. v. NLRB,* 510 U.S. 317, 329–30, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)). A court may invoke the doctrine of unclean hands "only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief." *In re Uwimana,* 274 F.3d 806 (4th Cir.2001).

In the present case, MGC acted in bad faith towards HUD. As discussed more fully in Part III. 1, *supra,* MGC orchestrated the submission of an unlawful bid to HUD. Moreover, after the HUD Contract was awarded, MGC racked up labor expenses well in excess of the amounts budgeted in the proposal and permitted under federal regulations and the terms of the Subcontract. (*Compare* Pl.'s Ex. 7 *with* Ct. Ex. 1.) Due to the budgetary provisions in the Subcontract, MGC could defer its invoicing for these excess labor costs until the reconciliation process at the end of each contract year. Whether deliberate or not, this practice obscured the true costs of MGC's work and hid the parties' violation of the "fifty percent rule" in 13 C.F.R. § 125.6(a). MGC and CLS are jointly responsible for the present situation, which has jeopardized an important government contract. (*See* Compl. ¶ 83.)

MGC also acted in bad faith towards CLS. In the Subcontract, MGC agreed that it would "provide and employ personnel necessary to accomplish the requirements of this Agreement whose total compensation (exclusive of bonuses) is no more than forty-nine (49%) of the total compensation paid to all employees." (Compl. Ex. 1 at § 2.5.) MGC completely failed to comply with this provision.

The situation that MGC currently finds itself in is entirely one of its own making. MGC had an opportunity to join with other eligible § 8(a) contractors to bid on the HUD contract. Instead, MGC chose to team up with CLS—a janitorial service company with no prior experience in the loan servicing field. Based on Griffin's testimony at the preliminary injunction hearing, the Court has no doubt that MGC was motivated to select CLS, at least in part, because MGC thought that it would dominate the HUD Contract and violate both § 2.5 of the Subcontract and applicable federal regulations with impunity, and Moore for CLS agreed to all of this. MGC finds itself cut off from revenue because CLS is pursuing a greater share of the profits.

As the Supreme Court stated over a century ago, if a "party has been engaged in an illegal business and been cheated, equity will not help him." *Wheeler v. Sage,* 68 U.S. 518, 529, 1 Wall. 518, 17 L.Ed. 646 (1863). From the moment MGC and CLS bid on the HUD Contract, MGC's actions have been unlawful, inequitable, and unconscionable. Under the circumstances, the Court must invoke the unclean hands doctrine not for CLS's protection, but for its own. *See Mas v. Coca-Cola,* 163 F.2d 505, 507 (4th Cir.1947).

To be clear, the Court does not condone CLS's actions in this case. CLS knew, or at least should have known, that the parties' bid was unlawful under governing federal regulations. Moreover, throughout the course of the litigation before this Court, CLS has adopted a scorched-earth policy inviting the Court to strike down the parties' contract, rather than reaching an agreement with MGC to complete the term of the HUD Contract. Despite clear indications from the Court as to its intentions, CLS has insisted on a judicial determination of the lawfulness of its contract. In the end, CLS has succeeded in winning a dismissal of MGC's case—but at the cost of having the HUD Contract declared unlawful and void. Plainly, CLS is similar to the youngster who brings his softball to the game. Since he has the only softball, he states that if he is not allowed to pitch then he will take his ball home. Clearly, Moore has deliberately invited this opinion despite knowing the result.

### 4. MGC's Claims for Injunctive Relief are not Proper under Bradley

 Even if the Court were to consider an award of injunctive relief in this case, much of the relief that MGC has requested goes well beyond the bounds of the Court's authority. The Fourth Circuit delineated a district court's authority to grant an injunction pending arbitration in *Merrill Lynch v. Bradley*, 756 F.2d 1048 (4th Cir. 1985). In *Bradley*, the Fourth Circuit held that

> where a dispute is subject to mandatory arbitration under the Federal Arbitration Act, a district court has the discretion to grant a preliminary injunction *to preserve the status quo* pending the arbitration of the parties' dispute if the enjoined conduct would render that process a "hollow formality." The arbitration process would be a hollow formality where "the arbitral award when rendered could not return the parties substantially to the *status quo ante.*"

*Id.* at 1053–54 (quoting *Lever Brothers Co. v. Int'l Chem. Workers Union,* 554 F.2d 115, 123 (4th Cir.1976)) (emphasis added).

*Bradley* clearly permits a district court to preserve the *status quo* pending arbitration. *See, e.g., Disston Co. v. Sandvik, Inc.,* 750 F.Supp. 745, 749 (W.D.Va.1990). In the present case, however, MGC is seeking injunctive relief that goes well beyond mere preservation of the *status quo.* MGC seeks, *inter alia,* an order requiring CLS to pay MGC's future monthly invoices, to restore MGC as an account holder of the Contractor Master Account, and to submit to binding arbitration. *Bradley* does not expressly permit the entry of injunctive relief that alters, rather than preserves, the *status quo.*

The only case in the Fourth Circuit to directly address this issue is *Pisgah Labs, Inc. v. Pharmaforce, Inc.,* No. 1:05cv334, 2005 WL 3116584 (W.D.N.C. Nov. 22, 2005). In *Pisgah,* the parties agreed to select a marketing agent by mutual consent. When negotiations broke down, the defendant unilaterally appointed its choice of marketing director. The plaintiff sought injunctive relief appointing a different company as marketing director.

The Western District of North Carolina denied the motion for injunctive relief, stating as follows:

> This case presents the opposite of the normal circumstance in which a party seeks to preserve the status quo while the issue between the parties is litigated. This case presents a circumstance in which granting the preliminary injunction will, in effect, moot the arbitration. Injunctive relief in this case would not preserve the status quo but instead hand

the plaintiff a victory prior to arbitration.

2005 WL 3116584, slip op. at *3.

*Pisgah* is arguably in tension with the Fourth Circuit's decision in *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir.1991), *overruled on other grounds by Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (2009). In *Rum Creek*, the Fourth Circuit held that a district court could issue an injunction barring police officers from enforcing a statute, notwithstanding the fact that such an injunction would alter the *status quo:*

> The phrase, "preservation of the *status quo*," however, does not symbolize an additional separate test. *See Ortho Pharmaceutical Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir.1989). We prefer not to label a particular moment in the past the "*status quo.*" When the current statute is alleged to be unconstitutional, and continued adherence to the statute pending the trial may affect the court's ability to render a meaningful decision, the *Blackwelder* standard properly applies.

*Rum Creek*, 926 F.2d 353 at 360. Admittedly, *Rum Creek* did not specifically involve an injunction pending arbitration. But the Fourth Circuit relied on a Third Circuit case, *Ortho Pharmaceutical Corp.*, which *did* involve an injunction pending arbitration.

■ The common thread running through *Pisgah* and *Bradley* can be simply stated: a district court should grant injunctive relief to preserve the process of arbitration, not to supplant it. As the Third Circuit stated in *Ortho Pharmaceutical*,

> [C]ourts invoke the phrase "preservation of the *status quo*" as a summary explanation of the need to protect the integrity of the applicable dispute resolution process.... Moreover, because the district court must focus on preservation of the integrity of the arbitration process, the relief granted need not be limited to restoring the parties precisely to their pre-litigation position without regard to the irreparable injury that movant faces. If the existing "status quo" is currently causing one of the parties irreparable injury and thereby threatens to nullify the arbitration process, then it is necessary to alter the situation to prevent the injury.

882 F.2d at 814.

In the present case, there is a proven threat to the process of arbitration in that MGC may go out of business or be forced to lay off its employees before the arbitration hearing. The Court therefore assumes, without deciding, that it may have the authority to grant injunctive relief ordering CLS to pay MGC's properly submitted invoices. However, it will not further unlawful conduct. To the extent that MGC requests the following injunctive relief, however, it requests a ruling from the Court on matters that are more properly left for arbitration:

> c. restoring the status quo ante by requiring CLS to add MGC as joint account holder of Wachovia Bank Account No. 2000026610100 and restoring MGC's electronic access to that account;
>
> d. enjoining CLS from making any unilateral decisions under the HUD Contract without consent or approval of MGC, as required by Section 2.6 of the Subcontract;
>
> e. enjoining CLS from taking any actions outside the ordinary course of performance of the Subcontract, including, but not limited to communicating unilaterally and without consultation, with HUD, with regard to MGC's performance;
>
> f. taxing all costs of this action against CLS and awarding them to Morris–Griffin Corporation; and

g. granting Morris–Griffin Corporation such other and further relief that the Court finds is just and proper, including, but not limited to its attorneys fees, costs, and other expenses.

Accordingly, even if the Court were to disregard the fundamentally unlawful nature of the parties' dealings and to consider the claim for injunctive relief on the merits, the Court would deny the Motion for injunctive relief as to the above-quoted items.

## IV. CONCLUSION

Every case stands on its own facts. "[L]egislatures make law wholesale, judges retail." Joseph P. Lash, *From the Diaries of Felix Frankfurter* 67 (1975) (quoting unidentified letter from Felix Frankfurter to Hugo Black). Nonetheless, since the Court's opinion has heretofore addressed only the conduct of the parties to this suit, the Court feels compelled to place its opinion within the larger context of the practice small business set-asides.

It has come to the Court's attention that government set-aside contracts are susceptible to finagling. Under 13 C.F.R. § 121.405(b), an SBA contracting officer "may accept a concern's self-certification as [a small business concern as] true for the particular procurement involved in the absence of a written protest by other offerors or other credible information which causes the contracting officer or SBA to question the size of the concern." An individual SBA officer has little incentive, if any, to question a particular small business' certification. After all, the percentage of federal contracting dollars set aside for small business concerns is publicly reported. The Department of Housing and Urban Development, in particular, has a reputation as being the "friendliest" cabinet-level agency to small business. *See* Business Research Services, Inc., *Set-Aside Alert*, Sept. 9, 2005 (available at 2005 WLNR 26158148). In 2005, HUD awarded nearly three-quarters of its contracting budget to small business concerns. *See id.*

The incentives that this system creates are perverse. Small business concerns enter into teaming agreements where their primary contribution is one thing and one thing only: eligibility for § 8(a) contracts. This practice is amply demonstrated by the facts of the current case, where a janitorial firm nominally secured a multi-million dollar contract to perform mortgage loan servicing, despite a complete lack of any prior experience in the industry. Does this truly benefit small businesses? Certainly their owners can profit from this arrangement. But in terms of actually allocating work to the small businesses that are so vital to our nation's economy, the system is hardly ideal.

This case is highly unusual, in that CLS has pursued its right to a larger share of the contract all the way to the courthouse, despite knowing full well the dangers that a judicial opinion might carry. The Court cannot, in good faith or good conscience, adhere to the form of the parties' Subcontract and resolve this matter as if it were a lawful transaction. The Court must look to the substance of the parties' dealings, and acknowledge the proven fact that MGC has performed the bulk of the work due under the HUD Contract—in flagrant disregard of applicable federal regulations. Ostensibly, CLS is trying to comply with the 50% requirement, but in reality it desires to take over the HUD Contract and drive MGC out. Whether or not HUD is damaged or whether CLS can perform it seems unimportant.

What is not unusual, at least to the Court's mind, is the arrangement between the parties. Without an effective mechanism to verify a small business concern's capability to perform its § 8(a) contract, the SBA has invited the very problems

that this case presents. This harms not only the public fisc, but also small business owners. In enacting 15 U.S.C. § 637(a), surely Congress did not intend to create a class of small businesses whose chief asset is their eligibility for set-asides. Rather, Congress intended to create a class of small businesses capable of performing important federal contracts. In that sense, both MGC (in the mortgage servicing business) and CLS (in the janitorial services business) are success stories. The problem in the present case is that MGC tried to take the easy way out, and is now paying the consequences as it chose its own partner.

For the reasons set forth herein, MGC's Motion for Temporary Restraining Order and Preliminary Injunction is hereby **DENIED**. This case is **DISMISSED** and **REMOVED** from the Court's docket.

The Clerk of the Court is **DIRECTED** to transmit a copy of this Order to all counsel of record.

The Clerk of the Court is further **DIRECTED** to transmit a copy of this Order to the following individual:

Randa Usel
U.S. Department of Housing and Urban Development, Western Field Contracting Operations
1670 Broadway, 23rd Floor
Denver, CO 80202–4801

**IT IS SO ORDERED.**